FILED
2013 Oct-01  PM 12:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **KIMBERLY FIFE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.: 4:12-CV-3602-VEH** |
| ) | |
| **COOPERATIVE BENEFIT** ) | |
| **ADMINISTRATORS, INC., and the** ) | |
| **NATIONAL RURAL ELECTRIC** ) | |
| **COOPERATIVE ASSOCIATION** ) | |
| **GROUP BENEFITS PROGRAM,** ) | |
| ) | |
| **Defendants.** ) | |

---

## MEMORANDUM OPINION

This case is brought under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). On September 13, 2012, the plaintiff filed this civil action in the Circuit Court of Etowah County, Alabama, alleging that defendant Cooperative Benefit Administrators, Inc. ("CBA"), wrongfully denied the plaintiff's long term disability ("LTD") benefits due her under a long term disability plan (the "Plan") provided by her former employer Cherokee Electric Cooperative ("Cherokee"). (Doc. 1-1, at 3). CBA removed the case to this court on October 15, 2012. (Doc. 1 at 1). On January 8, 2013, the plaintiff amended her complaint to add the National Rural Electric Cooperative Association Group Benefits Program

("NRECA") as a defendant, alleging that "[p]laintiff has long term disability protection through the National Rural Electric Cooperative Association Group Benefit Plan which is administered by Cooperative Benefit Administrators, Inc." (Doc. 9 at 1).

The case is now before the court on the plaintiff's motion for summary judgment (doc. 17), the defendants' motion to strike the plaintiff's reply brief to that motion, or in the alternative for leave to file a surreply (doc. 26), the plaintiff's motion for discovery (doc. 29), the plaintiff's motion to strike submissions filed by the defendants (doc. 30), and the plaintiff's motion for extension of time to complete discovery (doc. 35).

For the reasons stated herein, the court, *sua sponte*, will strike the statement of facts contained in the plaintiff's reply to the motion for summary judgment. The defendant's motion to strike will be **GRANTED in part** and **DENIED in part**. The plaintiff's motion to strike will be **DENIED**. The motion for summary judgment will be **DENIED**. The plaintiff's motions for discovery and motion for extension of time will be **DENIED**.

## I.   THE STATEMENT OF FACTS IN THE PLAINTIFF'S REPLY BRIEF

The court's summary judgment scheduling order provides that in the initial brief

> [t]he moving party shall list in separately numbered paragraphs each material fact the movant contends is true and not in genuine dispute, and upon which the moving party relies to demonstrate that it is entitled to summary judgment. Each such statement must be followed by a specific reference to those portions of the evidentiary record that the movant claims supports it.

(Doc. 2 at 16-17).  Despite this requirement, the plaintiff did not submit a statement of facts in her initial brief.  In her reply brief, under the heading "Statement of Facts," she writes: "In lieu of a Statement of Facts, [in the initial brief] [p]laintiff set out the decision documents which show that DMS was the actual decision maker on the appeal, not CBA."  She then, in her reply brief, offers six numbered facts in order to explain what "[t]he documents show."  (Doc. 25 at 7).

The scheduling order specifically states that the reply "shall consist of only the moving party's disputes, if any, with the non-moving party's additional claimed undisputed facts."  (Doc. 2 at 18-19) (emphasis added).  It also provides: **"These instructions must be followed explicitly. Except for good cause shown, briefs and evidentiary materials that do not conform to the following requirements may be stricken."**  (Doc. 2 at 14) (emphasis in original).  This attempt to set out facts to which the defendants have never had an opportunity to respond violates the scheduling order.  Accordingly, the court, *sua sponte*, will **STRIKE** this portion of the reply brief.

## II.   THE DEFENDANTS' MOTION TO STRIKE (DOC. 26)

The scheduling order also provides that "[r]eply briefs are limited to ten pages." (Doc. 2 at 15).  The defendant asks the court to strike the plaintiff's brief because it exceeds this limitation by nine pages, or, in the alternative, allow the defendant to file a surreply. (Doc. 26 at 2).  Instead of responding to the defendant's argument, the plaintiff merely consents to the defendants being allowed to file a surreply. (Doc. 27 at 1).

The court has reviewed the reply brief and notes that, beginning at page 12, the reply brief consists only of argument that was cut and pasted from the plaintiff's initial brief. (Compare doc. 17 at 9-16 with doc. 25 at 12-19).  Because the reply fails to comply with this court's scheduling order, and because most of the reply after page ten duplicates arguments previously made, the motion will be **GRANTED in part**.  Every page of the brief <u>after</u> page ten will be **STRICKEN**.   In all other respects, the motion to strike will be **DENIED**.

## III.   THE PLAINTIFF'S MOTION TO STRIKE (DOC. 30)

The plaintiff moves to strike the following documents submitted by the defendants in opposition to the pending motion for summary judgment (doc. 17): the Affidavit of Peter Baxter (doc 21-1 at 1-6); the NRECA Group Benefits Program Trust Document (doc. 21-3 at 2-27); the IRS Determination Letter (doc. 21-4 at 2-3);

and the CMA Administrative Services Agreement (doc. 21-4 at 5).  Her entire motion

reads as follows:

> Peter Baxter's affidavit is not included in the claim file and Peter Baxter is not listed on the initial disclosures. Plaintiff objects to adding affidavits to the Administrative Record[.]  Defendants are not entitled to supplement the record. The only plan at issue is the LTD Plan. The IRS letter was not listed in Initial Disclosures and is not included in the Administrative Record.
>
> Plaintiff does not object [to] basic claim documents. Plaintiff does object to other documents which are not in the Administration [sic] Record.

(Doc. 30 at 2).  The plaintiff offers no legal authority in support of her argument.

It is true that in <u>denial-of-benefit</u> cases, the evidentiary record is generally

limited to the plan documents and the administrative record.  *See, e.g., Blankenship*

*v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011) *cert. denied*, 132 S. Ct.

849, 181 L. Ed. 2d 549 (U.S. 2011) ("Review of the plan administrator's denial of

benefits is limited to consideration of the material available to the administrator at the

time it made its decision.").  However, the issue in the instant motion is not denial of

benefits.  It is the proper standard of review and whether to consider an alleged

conflict of interest in this case.  Accordingly, the court may look outside the

administrative record.

Further, except for the affidavit, all of the documents the plaintiff seeks to

strike <u>were</u> included in initial disclosures.  (Doc. 32-2 at 2-3).  The motion to strike will be **DENIED**.

## IV.    THE MOTION FOR SUMMARY JUDGMENT

### A.    <u>Standard</u>

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted).  The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact."

*Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## B.   Undisputed Facts

As noted above, the plaintiff offered no facts in support of her motion. The defendants have offered the following facts, set out as they were offered, which the

8

plaintiff has not disputed:

1.     This is a disability claim by a former Accounting – Payroll Clerk who was employed by Cherokee Electric Cooperative prior to her alleged disability.

2.     Cherokee Electric Cooperative is a rural electric cooperative and is a contributing employer to the Plan.

3.     NRECA is a not-for-profit corporation organized under the cooperative association laws of the District of Columbia with its principal place of business in Arlington, Virginia.

4.     NRECA is the national trade association for the more than 1,000 rural electric cooperatives located throughout the United States.

5.     NRECA offers a number of services to its member systems and certain companies affiliated with NRECA, including sponsoring disability, life, accident, medical and other welfare benefit plans.

6.     These welfare benefit plans are made available to member systems through the NRECA Group Benefits Program.

7.     The NRECA Group Benefits Program is an "employee welfare benefit plan" as defined in ERISA § 3(1), 29 U.S.C. § 1002(1), that provides benefits to employees of rural electric cooperatives that elect to participate in the Plan.

8.     The Plan is structured as a master plan with several component plans of benefits, including the self-insured NRECA long term disability ("LTD") plan.   For ease of reference, the master Group Benefits Program, and component LTD plan, shall be referred to collectively as "the Plan" unless further differentiation is needed for context.

9.     The Plan is a single Plan as noted in Plan Section 7.03 ("The Program is one, single plan of welfare benefits as defined in Section 3(1) of ERISA and the reference to the various component Plans of the

Program are used only for convenience in administration of the Program.").

10.    Further, the terms of the master plan document are applicable to all of the component plans, including the LTD plan.

11.    Rural electric cooperatives that participate in the Plan make contributions that are used to pay benefits.

12.    The contributions are held in a trust fund called the NRECA Group Benefits Trust (the "Trust").

13.    The Trust is a tax-exempt Voluntary Employees' Beneficiary Association (or "VEBA") as defined in Section 501(c)(9) of the Internal Revenue Code of 1986.

14.    The Trust's status as a VEBA has been confirmed by way of a favorable determination letter issued by the Internal Revenue Service.

15.    The Trust is regulated by comprehensive Internal Revenue Service regulations governing the use and disposition of funds held in VEBA trusts.

16.    The regulations contain "anti-inurement" provisions preventing anyone other the Plan participants from receiving earnings of the Trust. See 29 C.F.R. §§ 1.501(c)(9)-1(d) and 1.501(c)(9)-4.

17.    Consistent with the applicable anti-inurement regulations, the Plan provides that "[n]o person shall have any rights in or to the Trust Fund or any part thereof except as expressly provided in the Trust Agreement or as provided herein."

18.    Similarly, the Trust contains an exclusive benefit provision consistent with the VEBA anti-inurement regulations.

19.    Of particular relevance here, the LTD benefits payable under the Plan are funded solely through the contributions from participating

cooperatives and participants and are paid out of the Trust.

20.     Neither an insurance policy nor an insurance company is involved in either the funding or determination of benefits.

. . .

22.     Finally, the amount of contributions to the trust are determined on an actuarial basis.

23.     The actuarial calculations do not take into account the pending claim determination of any participant's individual claim.

24.     CBA is a subsidiary of NRECA, is organized under the laws of Nebraska, and maintains its principal place of business in Lincoln, Nebraska.

25.     CBA is the claims adjudicator for the NRECA LTD Plan, and is a "named" fiduciary as defined in § 402(a) of ERISA, 29 U.S.C. § 1102(a). Thus, "[c]laims for benefits and appeals of denied claims under the Plan shall be administered in accordance with Section 503 of ERISA, the regulations thereunder ... and the procedures adopted by CBA ... for such purpose."

26.     Plan   §   9.04   allows   fiduciaries   to   delegate   fiduciary "responsibilities, obligations and duties with respect to the Program" except as otherwise prohibited by ERISA.

27.     In fact, as confirmed by Plan § 9.06, CBA has been delegated substantial fiduciary responsibilities for claims determinations:

> the discretion and final authority to interpret and construe the terms of the Plans; to determine coverage and eligibility for benefits under the Plans; to adopt, amend, and rescind rules, regulations and procedures to [its] duties under the Plans, and the administration of the Plans; ... and to make all other determinations deemed necessary or

advisable for the discharge of [its] duties or the administration of the Program. The discretionary authority . . . of CBA and [its] delegates is final, absolute, conclusive and exclusive, and binds all parties. NRECA, as Plan Sponsor, specifically intends that judicial review of any decision of . . . CBA, and [its delegates] . . . be limited to the arbitrary and capricious standard of review.

28.    CBA is contracted to provide services under an Administrative Services Agreement ("ASA Agreement") with the Trust.

29.    Under the ASA Agreement, CBA is delegated responsibility for handling claims and appeals of benefit denials:

In administering claims under the Plans, CBA shall provide adequate notice in writing to any person whose claim for benefits under the Plan has been denied, setting forth the specific reasons for such denial, and shall afford a reasonable opportunity to any person whose claim for benefits has been denied for a full and fair review by CBA of the decision denying the claim. The Group Benefits Trust and CBA agree that with respect to the Employee Retirement Income Security Act of 1974, CBA shall be the "appropriate named fiduciary" of the Plans for the purpose of such review and decision thereon, and shall have no other fiduciary duties under the Plan. CBA's decision on any claim shall be final.

30.    CBA is paid for its services under the ASA Agreement on the basis of a "per capita" fee schedule. CBA is thus paid a flat fee based on the number of participants in the Plan, without regard to the number of denied claims.[1]

---

[1]The defendant offers the following fact which the plaintiff disputes: "31. Fife's claim was handled from start to finish by CBA. Neither the plan sponsor (NRECA) nor Fife's employer (Cherokee Electric Cooperative) played any role in deciding his claim." (Doc. 21 at 10). No citation to the record was provided as required by this court's summary judgment scheduling order. (See doc. 2 at 18). The fact will not be included. Similarly, the following fact, also

. . .

34.    Fife worked for Cherokee Electric Cooperative before claiming a disability. Cherokee Electric Cooperative is a rural electric cooperative, a member of NRECA, and a contributing employer to the NRECA Group Benefits Program.

35.    Accordingly, Cherokee Electric Cooperative makes contributions to the Plan that are determined on an actuarial basis and held in trust.

36.    Cherokee Electric Cooperative played no role in the determination of claims for benefits under the Plan.

(Doc. 20 at 4-11) (record citations omitted).

C.    **Additional Facts**

Peter Baxter, the Senior Vice-President of Insurance and Financial Services for the NRECA, stated in his affidavit:  "CBA has no financial responsibility for the benefits payable under the Plan."  (Doc. 21-1 at 4).  Baxter also stated that Cherokee, the plaintiff's employer, who contributes funds to the trust to pay benefits, "is not involved in rendering decisions on claims for benefits."  (Doc. 21-1 at 4).  Baxter also testified:

26.    DMS is an independent contractor that provides services to CBA consisting of reviewing CBA's file, investigating an appeal through, among other things, consultation with consulting physicians, and providing recommendations to CBA in connection with plan participant

---

offered by the defendant without a citation to the record, and also disputed by the plaintiff, will not be included: "[W]hile DMS provided certain consultative services to CBA, it did not decide Fife's claim."  (Doc. 20 at 10).

appeals.

27.     A true and correct copy of the Agreement between CBA and DMS is attached to this affidavit as Exhibit E.[2]

(Doc. 21-1 at 4-5).

Exhibit "E" to Baxter's deposition (doc. 21-4 at 5-11) is actually the "Administrative Services Agreement between CBA and NRECA."  Exhibit "F" is a docket entitled "Appeals Administration Agreement Between [DMS] and [the NRECA group benefits program]." (Doc. 21-4 at 13-32).  That agreement defines the "Administrator" as DMS.  (Doc. 21-4 at 14).  But is also states that "[CBA] . . . administers the Plan, adjudicates claims for benefits under the Plan, and pays benefits on behalf of Plan participants who are eligible to receive benefits under the Plan[.]" (Doc. 21-4 at 14).  It is also clear that "[DMS] has significant experience in the area of disability claims and appeals administration and adjudication, and [the NRECA group benefits program] wishes to rely on such experience as a resource for CBA for its adjudication of Appeals[.]" (Doc. 21-4 at 14).   It states that the agreement is for the purpose of "delivery by [DMS] of certain administrative services to CBA with respect to the Appeals."  (Doc. 21-4 at 14).  In the agreement, DMS agrees to "provide to CBA a <u>recommendation</u> on each Appeal <u>for adjudication by CBA,</u>

_____

[2] The agreement is attached to the affidavit as Exhibit "F."

14

including recommendations for strengthening CBA's administrative record." (Doc.

21-4 at 15) (emphasis added).  The agreement also states:

> In its performance of Appeals administration duties, [DMS] shall act
> solely in a consultative capacity to perform its duties . . ..  [DMA] is not
> a fiduciary with respect to the Plan under ERISA or any other applicable
> law. [DMS] shall have no discretionary authority of control over the
> disposition of Plan assets.  Nothing herein authorizes [DMS] to exercise
> discretionary authority over Appeals administration and adjudication.

(Doc. 21-4 at 17) (emphasis added).  Baxter stated in his affidavit that, consistent

with this provision, "DMS provides these services solely in a consultative capacity

and without having or exercising any fiduciary or discretionary authority regarding

the Plan or plan participants' claims for benefits."  (Doc. 21-1 at 5).

The appeal denial letter, issued by CBA, is dated May 31, 2011.  (Doc. 17-3

at 1).  The analysis of the plaintiff's claim, which is contained in that letter, mirrors

almost exactly a May 23, 2011, letter recommending that the plaintiff's appeal be

denied.  (Doc. 17-2).  The recommendation letter, on its face, appears to be written

by an "Appeals Specialist" named Annette Jung.  (Doc. 17-2 at 6).  While the plaintiff

contends that this letter was actually from DMS, the letter does not indicate that, and

she has cited no evidence to that effect.

### D.   **Analysis**

The plaintiff's motion asks the court to determine "as a matter of law that the

standard of review is de novo because discretionary authority has not been effectively given to the DMS, the actual decision maker in this case." (Doc. 17 at 1). She also moves the court to "determine that a conflict of interest be considered as a factor because benefits are paid by the employer." (Doc. 17 at 1). The court will address each contention in turn.

### 1.   *De Novo Review*

### a.   **Applicable Standard**

ERISA does not contain a standard of review for actions brought under 28 U.S.C. § 1132(a)(1)(B) challenging benefit eligibility determinations. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108-09 (1989) ("Although it is a 'comprehensive and reticulated statute,' ERISA does not set out the appropriate standard of review for actions . . . challenging benefit eligibility determinations."). Moreover, the case law that has developed over time governing such standards has significantly evolved. A history of the evolution of these standards is useful to track its development and shed light on the current framework.

In *Firestone*, the Supreme Court initially established three distinct standards for courts to employ when reviewing an ERISA plan administrator's benefits decision: "(1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious where the plan grants the administrator discretion; and (3)

16

heightened arbitrary and capricious where the plan grants the administrator discretion and the administrator has a conflict of interest." *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010) (citing *Buckley v. Metro. Life*, 115 F.3d 936, 939 (11th Cir. 1997) (discussing *Firestone*, 489 U.S. at 115)).  In *Williams v. Bellsouth Telecomms.*, *Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004), *overruled on other grounds by Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352 (11th Cir. 2008), the Eleventh Circuit fleshed out the *Firestone* test into a six-step framework designed to guide courts in evaluating a plan administrator's benefits decision in ERISA actions. When the Eleventh Circuit created the *Williams* test, the sixth step of the sequential framework required courts reviewing a plan administrator's decision to apply a heightened arbitrary and capricious standard if the plan administrator operated under a conflict of interest.  *See id*.  The Eleventh Circuit later modified this step in response to the Supreme Court's ruling in *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 115-17 (2008), which concluded that a conflict of interest should be weighed merely as "one factor" in determining whether an administrator abused its discretion.  *See Doyle,* 542 F.3d at 1359 ("As we now show, *Glenn* implicitly overrules and conflicts with our precedent requiring courts to review under the heightened standard a conflicted administrator's benefits decision.").  The Eleventh Circuit's latest iteration of the *Firestone* standard-of-review framework is found in

17

*Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350 (11th Cir. 2011), *cert. denied*, 132

S. Ct. 849:

> (1)   Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2)   If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3)   If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

> (5) If there is no conflict, then end the inquiry and affirm the decision.

> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355.[3]  All steps of the analysis are "potentially at issue" where a plan vests

discretion to the plan administrator to make benefits determinations.  *See id.* at 1356

n.7.  Conversely, then, where a plan does *not* confer discretion, the court simply

---

[3]  "In ERISA cases, the phrases 'arbitrary and capricious' and 'abuse of discretion' are used interchangeably." *Blankenship*, 644 F.3d at 1355 n.5.

applies the *de novo* review standard established by the Supreme Court in *Firestone*. *See* 489 U.S. at 115 ("[W]e hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.").

The defendants bear the burden of proving that the arbitrary and capricious standard of review applies.  *Anderson v. Unum Life Ins. Co. of Am.*, 414 F. Supp. 2d 1079, 1095 (M.D. Ala. 2006) (*citing Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2nd Cir.2002); *Sharkey v. Ultramar Energy Ltd.,* 70 F.3d 226, 229 (2nd Cir.1995) (holding that fiduciary bears burden of proof on issue of standard of review "since the party claiming deferential review should prove the predicate that justifies it")).  The plaintiff asks the court to find "that the standard of review is *de novo*."  As shown, <u>all</u> ERISA claims are initially subject to *de novo* review.  What the plaintiff is actually asking the court to do is to <u>stop</u> the analysis of her claim after the first step set out in *Blankenship*.  That can only occur if the plan administrator has no discretion in deciding claims.

      **b.**    **The Arbitrary and Capricious (or Abuse of Discretion) Standard Applies**

          **(1)**    **There Is No Admissible Evidence Supporting the Motion**

It is undisputed that CBA, the claims administrator, is vested by the Plan with discretion in reviewing claims. Accordingly, all steps of the Eleventh Circuit's six-step framework are implicated. *Firestone*, 489 U.S. at 115; *Blankenship*, 644 F.3d at 1355-56. But the plaintiff argues that DMS, not CBA, was the <u>actual</u> decision maker. She states that when someone other than the claims administrator makes the decision to deny benefits, the decision must be reviewed *de novo*. (Doc. 17 at 6). The plaintiff cite's CBA's claim denial letter, dated May 31, 2011, and Jung's May 23, 2011, letter recommending that the plaintiff's appeal be denied. (Compare doc. 17-3 with doc. 17-2). She argues that these letters, the analysis sections of which mirror each other, show that DMS, not CBA, actually made the decision to deny the plaintiff's claim.

"In considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in an admissible form." *Denney v. City of Albany*, 247 F.3d 1172, 1191 n. 10 (11th Cir. 2001) (citation omitted). The letters at issue are not properly considered on the motion for summary judgment because the documents were not authenticated by affidavit, deposition or otherwise. *See, U.S. Aviation Underwriters, Inc. v. Yellow Freight Sys., Inc.*, 296 F. Supp. 2d 1322, 1327 n. 2 (S.D. Ala. 2003) (Steele, J.) (citing *Denney* and holding that

documents offered on motion for summary judgment, which were not authenticated by affidavit, deposition or otherwise, generally will not be considered).  There is no agreement among the parties that the letter from Jung is what the plaintiff says it is.[4] Further, the letter, on its face, does not even indicate that it is from DMS, or a representative of DMS.  The letters are not properly considered.[5]   Absent evidence that CBA did not make the decision to deny benefits, the motion for summary judgment is due to be denied on this issue.

### (2)    Eleventh Circuit Law

While the plaintiff insists that "[t]he law <u>in the Eleventh Circuit</u> and in all circuits is that [the] standard of review is *de novo* when an unauthorized person makes a decision," (doc. 17 at 6) she cites no Eleventh Circuit law on this issue, focusing instead on two Sixth Circuit cases.  That is curious since the court is aware of at least two Eleventh Circuit cases on point: *Baker v. Big Star Div. of the Grand Union Co.*, 893 F.2d 288 (11th Cir. 1989), and *Oliver v. Coca Cola Co.*, 497 F.3d 1181 (11th Cir. 2007) *reh'g granted, opinion vacated in part*, 506 F.3d 1316 (11th

---

[4]In their response brief, the defendants do not specifically discuss the letters at all. However, they argue that "[t]here is no proper support for Fife's conclusory allegation which is offered in clear violation of Rule 56(c)" and "Fife has failed to point to any materials in the record to support her unfounded assertion.  Similarly, contrary to Rule 56(c)(4) she has failed to offer an affidavit based on personal knowledge and setting forth facts that would be admissible in evidence to support her position."  (Doc. 21 at 15).

[5]Further, the Jung letter, on its face, states it is only a recommendation.

Cir. 2007) and *adhered to in part on reh'g sub nom. Oliver v. Coca-Cola Co.*, 546

F.3d 1353 (11th Cir. 2008).[6]

In *Baker v. Big Star Div. of the Grand Union Co.*, 893 F.2d 288 (11th Cir.

1989), a post-*Firestone* case, the Eleventh Circuit dealt with this issue.  In *Baker*, the

claimant worked for Grand Union, and applied for permanent disability under Grand

Union's LTD plan.  Under the plan, Grand Union, "reserved the right to review any

and all claim denials." *Baker*, 893 F.2d at 290. "Connecticut General [Life Insurance]

processed claims and disbursed benefit payments pursuant to Plan terms under an

administrative services agreement with Grand Union. Connecticut General did not

contract to provide Grand Union with benefits insurance for Grand Union

employees." *Id.*  Connecticut General found that the claimant "was ineligible for the

long-term, 'total disability' benefits," and denied the claim.  *Id.*  at 289.

The Eleventh Circuit, noting that "non-fiduciaries cannot be held liable under

ERISA," first determined that Connecticut General was not a fiduciary, writing:

> Grand Union did no more than "rent" the claims processing
> department of Connecticut General to review claims and determine the
> amount payable "in accordance with the terms and conditions of the
> Plan." Administrative Services Agreement § 2(a)(I). Grand Union
> reserved the right to review any and all claim denials. *Id.* at § 2(b). An
> insurance company does not become an ERISA "fiduciary" simply by

---

[6]The portion of the *Oliver* opinion which was vacated is not relevant to this discussion.
Plaintiff's counsel was also the plaintiff's attorney in *Oliver*.  The plaintiff does cite *Oliver* in her
discussion of the conflict issue.

performing administrative functions and claims processing within a framework of rules established by an employer, *Gelardi v. Pertec Computer Corp.,* 761 F.2d 1323, 1325 (9th Cir.1985), especially if, as in this case, the claims processor has not been granted the authority to review benefits denials and make the ultimate decisions regarding eligibility. *Howard,* 807 F.2d at 1564;[3] *DeGeare v. Alpha Portland Indus., Inc.,* 652 F.Supp. 946, 962 (E.D.Mo.1986) (payment of claims pursuant to provisions of benefits plan does not clothe administrator with discretionary authority to such an extent as to make administrator's role that of a fiduciary); *Munoz v. Prudential Insur. Co. of America,* 633 F.Supp. 564 (D.C.Colo.1986) ("ability to make policy decisions outside of a pre-existing or separate framework of policies, practices and procedures" determines ERISA fiduciary status).

We affirm the decision of the district court that Connecticut General is not an ERISA fiduciary under the terms of the Plan and therefore is not subject to suit for its part in denying Baker "total disability" benefits under the Plan.

*Id.*

The court then had to determine what standard of review was appropriate.

First, it noted the then recently decided *Firestone* case had held that

"a denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan[.]"

*Id.* at 290-91 (quoting *Firestone*, 489 U.S. at 113-114) (citations omitted).  Grand

Union argued that Justice O'Connor's use of the phrase "administrator or fiduciary"

in that quote meant that "all administrators are fiduciaries and all fiduciaries are

administrators."   The Eleventh Circuit disagreed, explaining that "a court must

23

exercise *de novo* review unless (1) the plan *fiduciary* has 'discretionary authority to determine eligibility for benefits or to construe the terms of the plan'; or (2) the plan *administrator* has 'discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Id.* The court then wrote:

> [I]t is clear that an administrator with discretionary authority *is* a fiduciary. *See* 489 U.S. at ----, 109 S.Ct. at 955, discussed *supra* at section I.
>
> Conversely, one who is *not* a fiduciary is also *not* "an administrator with discretionary authority" under 29 U.S.C. § 1002(16)(A) and (21)(A). "Administrators" are distinguished from "fiduciaries" by the former's lack of discretionary authority or discretionary control"; therefore, any entity or person found not to be an ERISA "fiduciary" cannot be an "administrator with discretionary authority" subject to the arbitrary and capricious standard.

*Id.* Because "Grand Union, not Connecticut General, was given the authority to review claim denials," and because "Connecticut General [was not] given the power to formulate policy or terms of eligibility under the Plan," the court held that "the benefits plan at issue in this case does not provide such discretion to its plan administrator." *Id.* Accordingly, the court remanded the case to the district court for *de novo* review.

In *Oliver*, the Eleventh Circuit set out the facts as follows:

> At issue in this case is the Long Term Disability Income Plan of the Coca-Cola Company (the "Plan"), an employee welfare benefit plan within the meaning of ERISA. *See* 29 U.S.C. § 1002(1). The Plan document designates Coca-Cola as the Plan Administrator. The Plan

24

> document also contains a delegation by Coca-Cola of some of its powers as Plan Administrator to The Coca-Cola Company Long Term Disability Income Plan Committee (the "Committee"). The Plan document delegates to the Committee "primary responsibility for the administration of the Plan, and all powers necessary to enable it to properly perform its duties," including "the discretionary authority to determine the eligibility of Participants to receive benefits and the amount of benefits to which any Participant may be entitled under the Plan." R1-24, Exh. 1 §§ F 7.2(b), (b)(3). The Plan also provides that the Committee "may delegate to the Administrative Services Provider" its discretionary authority to decide claims. *Id.* § 7.2(b)(3). Broadspire is the Administrative Services Provider.

> Under the Plan, a claim for benefits involves an initial application, and, if the claimant is unsatisfied with the result of the initial application, two levels of appeals. Pursuant to § 7.2(b)(3) of the Plan, the Committee delegated to Broadspire responsibility for making initial determinations of claims for benefits under the Plan, as well as responsibility for resolving first-level appeals. The Committee is responsible for deciding second-level appeals, although in 1995 the Committee delegated to two Coca-Cola employees (the "Delegates") its function of reviewing final claims.

*Oliver*, 497 F.3d at 1186. Broadspire conducted the initial review of the claimant's claim, which included sending questionnaires to the claimant's doctors and reviewing them once they were completed. Broadspire also arranged for a peer review of the forms submitted by the doctors. "On 19 June 2000, Broadspire sent Oliver a letter denying his claim. After receiving Broadspire's denial of his claim, Oliver filed a written appeal <u>with Broadspire</u>." *Id.* at 1188 (emphasis added). Thereafter, the claimant saw another doctor. When Oliver submitted the new doctor's records to Broadspire, Broadspire in turn submitted them to another doctor for a peer review.

25

Then, on October 16, 2000, Broadspire, citing the new peer review, denied this first level appeal. On December 13, 2000, Oliver filed a second-level appeal. Broadspire continued to collect records from the claimant and had them peer reviewed. On April 30, 2001, Coca-Cola, through the Committee, denied Oliver's second-level appeal.

The Eleventh Circuit wrote:

> Here, §§ 7.2(b)(2) and (3) of the Plan "express[ly]" and "unambiguous[ly]" granted discretion to the Committee-to which Coca-Cola delegated authority to determine final appeals-to interpret the Plan and to determine eligibility of Plan participants to receive benefits. *See id.* The Plan, however, did not confer such discretion on Broadspire, the company that Coca-Cola hired to administer initial claims and first-level appeals. Accordingly, the appropriate standard of review turns on whether Coca-Cola-acting through the Committee-or Broadspire was the plan administrator. The district court found that Broadspire was the true plan administrator, and consequently applied *de novo* review, correctly observing that the Plan does not confer discretion upon Broadspire. As explained subsequently, however, we find that Coca-Cola was the plan administrator, that the appropriate standard of review was arbitrary and capricious, and that the district court erred in holding otherwise.

*Id.* at 1193.

The Eleventh Circuit refused to find that Broadspire was the *de facto* plan administrator, writing:

> Were we to find Broadspire a *de facto* plan administrator on these facts, we would undercut the ability of employers to contract out the administrative tasks associated with operating an ERISA plan, a practice we upheld in *Baker. See id.* at 290. Indeed, it is hard to imagine how an administrative services provider could fulfill its functions without engaging in the types of activity that, in *Hamilton,* triggered the application of the *de facto* administrator doctrine. *See Hamilton,* 244

26

F.3d at 824 (finding that employer was *de facto* administrator because, *inter alia*, it distributed disability benefit application forms and "field[ed] questions about the plan from employees"). The First Circuit, which also recognizes the *de facto* administrator doctrine in some contexts, *see Law v. Ernst & Young,* 956 F.2d 364, 372-73 (1st Cir.1992), has also declined to apply the *de facto* administrator doctrine to a third party administrative services provider in circumstances similar to those here. *See Terry v. Bayer Corp.,* 145 F.3d 28, 35 (1st Cir.1998) ("[W]hen the plan administrator retains discretion to decide disputes, a third party service provider, such as Northwestern, is not a fiduciary of the plan, and thus not amenable to a suit under [ERISA].") (citations omitted). Because Broadspire is merely an administrative services provider, and because, under the Plan, Coca-Cola, through the Committee-not Broadspire-makes the final decision on benefits claims, we are bound by *Baker* to hold that Coca-Cola is the plan administrator. *See Baker,* 893 F.2d at 289-90. Accordingly, the appropriate standard of review was arbitrary and capricious, *see Hunt,* 119 F.3d at 912, and the district court erred in applying *de novo* review. Moreover, under *Baker,* Broadspire is not a proper defendant in this action. 893 F.2d at 290.

*Id.* at 1195.

In the instant case, DMS stands in an even more removed position than Broadspire did in *Oliver.*  There is no evidence that DMS actually sent the denial letter to the claimant.  There also is no evidence that it did anything more than make a recommendation to CBA.  Further, CBA is a "a named fiduciary" under the plan, and it has the final authority to determine "all claims for benefits under the Program." (Doc. 21-1 at 16).  Under *Oliver*, that is sufficient for the arbitrary and capricious standard to apply.

The evidence is overwhelming that DMS did not make the decision. Baxter

stated in his affidavit that the services DMS provides to CBA are "reviewing CBA's file, investigating an appeal through, among other things, consultation with consulting physicians, and providing recommendations to CBA in connection with plan participant appeals."  (Doc. 21-1 at 4-5).  The "Appeals Administration Agreement Between [DMS] and [the NRECA group benefits program]"  states that "[CBA] . . . administers the Plan, adjudicates claims for benefits under the Plan, and pays benefits on behalf of Plan participants who are eligible to receive benefits under the Plan[.]" (Doc. 21-4 at 14).  In the agreement, DMS agrees to "provide to CBA a recommendation on each Appeal for adjudication by CBA, including recommendations for strengthening CBA's administrative record." (Doc. 21-4 at 15) (emphasis added).  The agreement also states:

> In its performance of Appeals administration duties, [DMS] shall act solely in a consultative capacity to perform its duties . . .. [DMA] is not a fiduciary with respect to the Plan under ERISA or any other applicable law. [DMS] shall have no discretionary authority of control over the disposition of Plan assets. Nothing herein authorizes [DMS] to exercise discretionary authority over Appeals administration and adjudication.

(Doc. 21-4 at 17) (emphasis added).  Baxter stated in his affidavit that, consistent with this provision, "DMS provides these services solely in a consultative capacity and without having or exercising any fiduciary or discretionary authority regarding the Plan or plan participants' claims for benefits."  (Doc. 21-1 at 5).

In response to interrogatories propounded upon them, the defendants stated that

"Only CBA, the Appeal Administrator, and the Appeal Committee exercised discretion in determining whether or not benefits would be paid. . . . DMS . . . provided information and data that was considered by the fiduciaries in rendering their decisions." (Doc. 17-8 at 6).  They also stated:

> DMS, acting as an independent contractor, provided services consisting of reviewing CBA's file, investigating the appeal through, among other things, consultation with consulting physicians, and providing a recommendation to CBA in connection with Plaintiff's appeal. . . . DMS provided these services solely in a consultative capacity and without having or exercising any fiduciary or discretionary authority regarding the Plan or Plaintiff's claim for benefits.

(Doc. 17-8 at 19).

The plaintiff has cited no case where the use of an outside source to evaluate and make recommendations regarding a claim requires the court to declare that <u>only</u> a *de novo* review of the claim is appropriate.  As has been noted by the Tenth Circuit: "A fiduciary's decision to delegate does not violate his responsibility to the trust beneficiary insofar as the fiduciary himself remains personally liable for any decisions taken on his behalf. In sum, the fiduciary is responsible for actions performed in his name. . . . The same is true in the ERISA context." *Geddes v. United Staffing Alliance Employee Med. Plan*, 469 F.3d 919, 926 (10th Cir. 2006).  As the court in *Geddes* noted:

> Once a health plan administrator, the ERISA counterpart to trust law's fiduciary-trustee, has been delegated discretionary authority under

29

the terms of the ERISA plan, nothing prevents that administrator from then delegating portions of its discretionary authority to non-fiduciary third parties, as any similarly-situated trustee may do. This is especially true when such delegation is explicitly authorized by the plan document. The plan administrator remains liable, however, for decisions rendered by its agents, just as a trustee remains ultimately responsible for the actions of his delegates. In the instant case, the Plan specifically empowered its fiduciary . . . to employ an independent third party to review benefit claims, even while reserving to [the fiduciary] final authority over all benefit determinations. [The fiduciary's] decision to delegate limited authority to [the third party] according to the terms of the controlling Plan instrument accords with *Firestone* and with the background principles of trust law. It does not constitute a failure of fiduciary judgment sufficient to warrant de novo review.

*Geddes*, 469 F.3d at 926. Similarly, in the instant case, the Plan allows CBA as "a named fiduciary" to "use, employ, discharge or consult with any one or more individuals, corporations or other entities with respect to advice regarding any responsibility, obligation or duty." (Doc. 21-2 at 17, 18). CBA was ultimately responsible for the decision. Even if there was admissible evidence that CBA obtained a recommendation from DMS, that does not constitute a failure of fiduciary judgment.

### (3)   The Authority Cited By the Plaintiff Is Inapplicable and Unpersuasive

The plaintiff cites, without analysis, only two Sixth Circuit cases: *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 596 (6th Cir. 2001), and *Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 364 (6th Cir. 2009). The court is

unpersuaded by these cases.

In *Sanford*, after the claims administrator initially and erroneously granted benefits to the claimant, the claimant's employer, who had no authority under the Plan regarding benefits decisions, revoked the benefits. In *Majestic*, the court noted that there was no  evidence that the claims administrator, Majestic, took <u>any</u> part in the actual investigation of the claim.  The court wrote:

> First, the record shows that BAS alone investigated Weatherspoon's claim. All requests for documents appeared on BAS letterhead and were sent by BAS representatives. The documents in the record also indicate that BAS was the entity that made the ultimate decision to deny the Med's claim. Regarding the initial denial of benefits, for example, BAS's internal activity reports state that BAS concluded that the claim should be denied and "called Sally Ramirez to *inform* her of this claim and *let her know* that it is not covered." (A.R. 88 (emphasis added).)

> Similarly, Dawn Evanchik, a BAS representative, informed Ramirez in an email of the Med's appeal and advised her that "[*w*]e denied the claims based on 'an illegal act.' " (A.R. 150 (emphasis added).) The email further stated that "we will be reviewing this case ... and ... will be contacting you to discuss further." (*Id.*) Internal emails at BAS state that BAS is "working on this" appeal and that "BAS will submit notification of the results of said appeal" directly to counsel for the Med. (A.R. 147.) Later in the appeals process, BAS apprised Ramirez that BAS "has reviewed the appeal," was "still in the process of discovery," and would "update [Majestic] on [BAS's] final response shortly." (A.R. 36.)

> Communications with counsel for the Med further demonstrate that Majestic did not make the benefits decision. The letters to counsel were on BAS letterhead and indicated that BAS was responsible for reviewing both the claim and the Med's appeal of the denial of benefits. *See Anderson v. Unum Life Ins. Co. of Am.,* 414 F.Supp.2d 1079, 1098

(M.D.Ala.2006) (finding significant the fact that correspondence to the claimant instructed her to direct her appeal to the claims administrator). Most significantly, BAS issued the final denial letter to the Med on BAS letterhead. The letter stated that "[w]e have conducted a final review of the Plan's denial of benefits." (A.R. 3.) Further, BAS stated that its "decision to deny benefits [was] based on a reasonable interpretation of the Plan," indicating that BAS, rather than Majestic, interpreted the term "illegal act" in the Plan in determining whether Weatherspoon was eligible to receive benefits. *See Culp, Inc. v. Cain,* 414 F.Supp.2d 1118, 1125-27 (M.D.Ala.2006) (applying *de novo* review to the benefits decision because although the plan administrator had discretionary authority to interpret the plan, the plan administrator made no determination about the meaning of the plan provision at issue).

Accordingly, there is no evidence that Majestic was involved in BAS's decision to deny benefits. Although Ramirez submitted an affidavit stating that she was "in a continuing dialogue with BAS regarding whether [the] claim for benefits was payable pursuant to the terms of the Plan" and that she "approved the form and contents" of the denial letter before BAS sent the letter to the Med, (ROA vol. 1 at 199), the documents in the record suggest otherwise. For example, although the investigation into and initial denial of the Med's claim occurred in September 2005, Ramirez was unaware of the claim until at least October 3, 2005. That day, Ramirez sent an email to BAS requesting that BAS forward all previously sent emails and documents to her business email account, noting that she "no longer use[d]" the email account to which BAS had sent all of its correspondence regarding Weatherspoon's claim. (A.R. 143.) In addition, although BAS asked Ramirez to "review and approve" the final denial letter, BAS never requested that Majestic approve its decision to deny benefits. (A.R. 6.) Further, there is no evidence that Majestic even reviewed the letter, as Majestic did not make any changes to the denial letter or otherwise respond to BAS.

Despite the extensive evidence indicating that Majestic did not make the decision to deny benefits, Majestic argues that it is entitled to deferential review because it retained the "sole discretionary authority to determine eligibility for Plan benefits or to construe the terms of the

Plan." (ROA vol. 1 at 96, 104.) However, whether Majestic reserved for itself the discretion to determine eligibility under the Plan does not answer whether, in this particular case, Majestic exercised that discretionary authority. *See Anderson,* 414 F.Supp.2d at 1098 (concluding that, even if the plan documents gave the plan administrator the discretionary authority to decide benefits claims, the policy's terms "simply do not speak to the issue of whether or not [the fiduciary] actually retained its authority to make claims determinations"). Majestic has failed to meet its burden of proving that deferential review should apply to the decision to deny Weatherspoon's claim for medical benefits. *See Sharkey,* 70 F.3d at 230.

*Id.* at 366-67.

In the instant case, and unlike the *Sanford* case, the denial letter came from CBA, the entity specifically designated to determine benefit eligibility. Further, there is no evidence of conduct like that in *Majestic* to warrant a finding that CBA took no part in the investigation and denial of the claim.

The more deferential arbitrary and capricious standard will be applied to the decision to deny benefits.

### c.    Additional Briefing

In further support of her motion, the plaintiff has cited the "Summary Plan Description" which states that the "Plan Administrator" is "Senior Vice-President, Insurance & Financial Services, National Rural Electric Cooperative Association." (Doc 44-1 at 26).   This document also states that the plan administrator has "discretionary and final authority to interpret and implement the terms of the Plan,

resolve all ambiguities and inconsistencies, and make all decisions regarding eligibility and/or entitlement to coverage or benefits."  (Doc. 44-1 at 26).

The plaintiff does not explain for what purpose she cites to the SPD.  The court assumes that it is to create a genuine issue as to whom discretion was granted, since the language of the SPD appears to conflict with the Plan's language naming CBA as the Plan Administrator.  However, the Supreme Court has noted that "summary documents, important as they are, provide communication with beneficiaries *about* the plan, but that their statements do not themselves constitute the *terms* of the plan for purposes of § 502(a)(1)(B)."  *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1878, 179 L. Ed. 2d 843 (2011) (emphasis in original); *see also,  Lipker v. AK Steel Corp.*, 698 F.3d 923, 931 (6th Cir. 2012) ("Per *CIGNA, if* there is a conflict, the plan language controls over the SPD." ).

The plaintiff also cites CBA's response to interrogatories which she states shows "the composition of the Appeals Committee."  (Doc. 44 at 3).  The plaintiff does not state how this evidence helps her case, and the court will not guess.

## 2.   Consideration of Conflict of Interest

ERISA precedent is clear that, if a conflict exists, the court must consider it. *Blankenship*, 644 F.3d at 1355.  Although the plaintiff's motion is not clear as to what relief she seeks, the court assumes that the plaintiff is asking the court to determine

as a matter of law that a conflict exists.

The benefits in this case were to be paid from a trust.  For years, the Eleventh Circuit has consistently held that the existence of a trust from which benefits are paid eliminates any conflict of interest.  *See*, *White v. Coca-Cola Co.*, 542 F.3d 848 (11th Cir. 2008) ("circuit law is clear that no conflict of interest exists where benefits are paid from a trust that is funded through periodic contributions so that the provider incurs no immediate expense as a result of paying benefits"); *Gilley v. Monsanto Co., Inc.*, 490 F.3d 848, 856 (11th Cir. 2007) (same); *Turner v. Delta Family-Care Disability & Survivorship Plan*, 291 F.3d 1270, 1273 (11th Cir. 2002) (trust "eradicates" any alleged conflict); *Buckley v. Metro. Life*, 115 F.3d 936, 939 (11th Cir. 1997) (no conflict of interest where benefits paid from a trust funded through periodic contributions so that the provider incurs no immediate expense as a result of paying benefits).

The plaintiff cites a number of cases for the proposition that, even though benefits here would be paid from a trust, a conflict of interest can still exist.  She begins her analysis with the *Glenn* case, pointing out *Glenn's* requirement that the conflict of interest be weighed as one factor in determining whether there is an abuse of discretion.  She then cites the Ninth Circuit opinion of *Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1018 (9th Cir. 2008), stating that *Burke*

35

held that *Glenn* "requires consideration of conflict of interest when benefits are **paid from a Trust** and decision are made by an Employer **Benefit Committee**." (Doc. 17 at 7) (boldface emphasis in original).

In *Burke*, the plaintiff

qualified for coverage under Pitney's Long-Term Disability Plan (the "Plan"). The Plan is subject to the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1001 *et seq.* The Plan's Employee Benefits Committee (the "Committee") is responsible for the Plan's general administration, while Pitney's Disability and Benefits Department is delegated the day-to-day responsibilities. The Committee is the final decision-maker regarding benefits eligibility.

Benefits paid out by the Plan come from the Plan's Trust, which is funded in part by Pitney and in part by employee contributions. The Committee has the authority to determine the amounts of the employer and employee contributions to the Trust, but it is unclear from the record what portion of the Trust is funded by the employees, as opposed to by Pitney. The Trust fund is a Voluntary Employees' Beneficiary Association ("VEBA") Trust; therefore, the money paid into the Trust cannot revert back to Pitney.

*Burke*, 544 F.3d at 1018. Recognizing the *Glenn* decision, the Ninth Circuit wrote:

even when a plan's benefits are paid out of a trust, a structural conflict of interest exists that must be considered as a factor in determining whether there was an abuse of discretion. We reach this conclusion because, even though benefits are not paid directly by Pitney, Pitney obviously still has a financial incentive to keep claims' experience under the Plan as low as possible-the less the Trust pays out as benefits, the less Pitney will ultimately need to contribute to the Trust to maintain its solvency. Thus, although the impact may be less direct, there is nonetheless a close relationship between benefits paid by the Trust and the money Pitney must provide from its general assets to fund the Trust.

In discussing plans administered and funded directly by employers, the Supreme Court stated that " 'every dollar provided in benefits is a dollar spent by ... the employer; and every dollar saved ... is a dollar in [the employer's] pocket.' The employer's fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary." *MetLife,* 128 S.Ct. at 2348 (quoting *Bruch,* 828 F.2d at 144). Similarly, even when benefits are paid out of a trust, instead of directly by an employer, the employer has a financial incentive to deny claims because every dollar not paid in benefits is a dollar that will not need to be contributed to fund the Trust. Although this impact is indirect, and therefore a less significant conflict compared to plans with benefits paid directly by employers, a structural conflict of interest does exist. Thus, the structural conflict of interest must be considered as a factor in evaluating whether the Plan abused its discretion in terminating Burke's benefits. *See Abatie,* 458 F.3d at 968 (recognizing that structural conflicts of interest come in a variety of forms that should be weighed accordingly, and stating that "[a]n egregious conflict may weigh more heavily (that is, may cause the court to find an abuse of discretion more readily) than a minor, technical conflict might. But in any given case, all the facts and circumstances must be considered").

*Id.* at 1026 (emphasis added).

Even if the court were bound to apply *Burke*, which it is not, that case is distinguishable.   Here, it is undisputed that rural electric cooperatives, who are the employers of the claimants, make contributions to a trust which is then used to pay benefits.  CBA is the claims administrator.  Unlike *Burke*, in the instant case there is no evidence that any entity which contributes funds to the trust has any say in granting or denying claims.  *Glenn* held there was a conflict "where it is the employer that both funds the plan and evaluates the claims." *Glenn*, 554 U.S. at 112.  Because

here the employer is not in a position to deny claims, the argument that there is a conflict because "every dollar not paid in benefits is a dollar that will not need to be contributed to fund the Trust," does not apply.  Similarly,  *Smith v. Novelis*, 505-CV-0957 GTS/GJD, 2009 WL 3164798 at *14 (N.D.N.Y. Sept. 29, 2009), also cited by the plaintiff, is inapplicable.  *Smith*, 2009 WL 3164798 at *14 ("Defendants both evaluate and pay benefits claims under the Plan (and the record is not clear as to what steps Defendants have taken to reduce potential bias and to promote accuracy).  Thus, a conflict of interest exists.").

The court finds persuasive the opinion in *Taylor v. Nat'l Rural Elec. Co-op. Ass'n Grp. Benefits Program*, CV08-8131-PHX-JAT, 2009 WL 1812791 (D. Ariz. June 24, 2009), which dealt with the exact same plan and issue presented in the instant case.  The court wrote:

> Plaintiff relies heavily in his Brief on the holding in *Burke* that "even when a plan's benefits are paid out of a trust, a structural conflict of interest exists that must be considered as a factor in determining whether there was an abuse of discretion." 544 F.3d at 1026. However, *Burke* involved an employer-administered plan and an employer-funded trust. *Id.* Thus, the court in *Burke* found that the employer had "a financial incentive to keep claims' experience under the Plan as low as possible." *Id.* Under the structure utilized by NRECA to administer the Plan, however, there is no indication in any of the Plan or Trust documents that either NRECA or CBA has a financial stake in the outcome of claims. Def. Exhs. B–H. Neither NRECA nor CBA contributes funds directly into the Trust. Def. Exh. A at ¶¶ 12–13; 18–19; Def. Exh. B at §§ 5.01, 6.01. Rather, the Trust is funded entirely by contributions from contributing employers[.] *Id.* Moreover, CBA, the sole claims

adjudicator of the Plan, does not pay benefits out of its own pocket. *Id.* Rather, successful claims are paid directly from the Trust. *Id.* Thus, the two primary requirements for a structural conflict of interest cited above in *Glenn,* even when considered under the application in *Burke,* are missing here.

*Taylor*, 2009 WL 1812791 at *2.

Both before and after *Glenn*, the Eleventh Circuit has been clear that the conflict is created only when the administrator has a dual role in both deciding claims and paying benefits.  For example, in *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011) *cert. denied*, 132 S. Ct. 849, 181 L. Ed. 2d 549 (U.S. 2011), the court noted that "[a] pertinent conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds."  *See also, Townsend v. Delta Family-Care Disability & Survivorship Plan*, 295 F. App'x 971, 975 (11th Cir. 2008) (post-*Glenn*) ("A conflict of interest exists where the plan administrator determines eligibility for benefits and also pays those benefits out of its own assets.").  In *Gilley v. Monsanto Co., Inc.*, 490 F.3d 848, 857 (11th Cir. 2007), a case decided prior to *Glenn*, the Eleventh Circuit was clear that "[o]nly when benefits are paid from a provider's assets, so that benefit decisions have a direct and immediate impact on the provider's profit margin, does the heightened standard come into play."

The plaintiff argues that "*Glenn* overruled the two lines of Eleventh Circuit

precedent holding that the funding of benefits through a trust eliminates a conflict of interest and that an employer decision by a 'committee' eliminates any conflict of interest." (Doc. 17 at 12). The plaintiff insists that in *Oliver v. The Coca Cola Co.*, 546 F3d 1353 (11th Cir. 2008), the Eleventh Circuit acknowledged that *Glenn* "is an **intervening change of controlling law** on whether a conflict of interest can exist when benefits are paid from a Trust funded through nonreversionary contributions when decisions are made by a benefit committee." (Doc. 17 at 12)(boldface emphasis supplied).  In *Oliver*, the court dealt with the exact same plan at issue in *White*.  The *Oliver* court wrote: "[w]e have now issued a decision in *White,* finding Coca-Cola's interpretation of the offset provision to be reasonable and entitled to deference. *See White v. Coca-Cola Co.,* 542 F.3d 848, 850-51 (11th Cir.2008). In light of this controlling precedent, we remand this case to the district court solely on the issue of damages."  *Oliver*, 546 F.3d at 1353.  The court then noted:

> We note that, although the committee's interpretation, assuming it is the same as that advanced in *White,* would likely be reasonable, the district court can still consider whether the committee operated under a conflict of interest. Though such a conflict was found not to be present in *White,* Oliver might be able to provide evidence of one. *See* [*White,* 542 F. 3d] at 857-59. Based on the Supreme Court's recent decision in *Metropolitan Life Insurance Co. v. Glenn,* --- U.S. ----, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008), this determination would only be one factor in the court's "arbitrary and capricious" analysis, and would not necessitate application of a "heightened arbitrary and capricious" standard.

*Id.*

40

*Glenn* was not cited by the Eleventh Circuit for the proposition that *White*'s statement of the rule regarding trusts was overruled.  However, it is interesting that the Eleventh Circuit would, in *White*, determine that no conflict existed because of the trust, but in *Oliver* allow the district court to determine whether there was a conflict.  *Oliver* could not overrule *White*.  *United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993) ("[I]t is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court.").  The defendants argue that this was just a perceived conflict, because it is likely that the *Oliver* court was alluding to the issue discussed in *White*, as to whether the benefits were paid solely out of trust funds or some out of trust funds and some out of company assets.  (Doc. 21 at 23).  However, the *Oliver* case does not limit its statement in such a way.

The court sees no need to decide this dispute about the holding in *Oliver*, as the instant case is distinguishable.  Unlike *White* and *Oliver*, here, not only is there a trust, but the employer does not <u>both</u> administer claims <u>and</u> fund the trust.  There is no conflict here.

**V.**    **THE PLAINTIFF'S MOTION FOR DISCOVERY (DOC. 29), AND THE PLAINTIFF'S MOTION FOR EXTENSION OF TIME TO COMPLETE DISCOVERY (DOC. 35)**

These motions ask the court to allow the plaintiff to conduct additional discovery on the issue of whether CBA or DMS actually made the decision to deny benefits, before the court rules on the appropriate standard of review. However, as shown above, the plaintiff has not demonstrated why additional discovery should be expected to produce a different result than that reached in this opinion. According to *Oliver*, even if DMS denied the claim, because the ultimate authority remained with CBA, the arbitrary and capricious review would still apply.

Further, the discovery already conducted, and other evidence in the record, establishes that only CBA made the decision. The plaintiff has not shown that more discovery would show that DMS actually denied the claim. In her motion, she states that the claim activity log "shows significant investigation and evaluation of the claim by CBA prior to the denial." (Doc. 29 at 2) (citations omitted). She then states that "the entire claim was turned over to DMS" after the appeal. (Doc. 29 at 2). While the activity log does show a "referral" to DMS, that does not mean, or even imply, that DMS made the decision to deny the claim. Again, in the Plan, CBA is the only entity with authority to review and deny claims. The motions for discovery and for an extension of time to complete discovery will be **DENIED**.

## VI.   CONCLUSION

Based on the foregoing, the court, will *sua sponte,* rule that the statement of

facts in the plaintiff's reply brief is **STRICKEN**.  The motion to strike the plaintiff's reply brief will be **GRANTED in part**.  All pages of that brief after page ten will be **STRICKEN**.  In all other respects, the motion will be **DENIED**.  The plaintiff's motion to strike will be **DENIED**.  The motion for summary judgment will be **DENIED**.  The plaintiff's motions for discovery and for an extension of the discovery deadline will be **DENIED**.

A separate order will be entered.

**DONE** this 1st day of October, 2013.

**VIRGINIA EMERSON HOPKINS**
United States District Judge