FILED
2014 Sep-10  AM 11:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **KIMBERLY FIFE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.: 4:12-CV-3602-VEH** |
| ) | |
| **COOPERATIVE BENEFIT** ) | |
| **ADMINISTRATORS, INC., and the** ) | |
| **NATIONAL RURAL ELECTRIC** ) | |
| **COOPERATIVE ASSOCIATION** ) | |
| **GROUP BENEFITS PROGRAM,** ) | |
| ) | |
| **Defendants.** ) | |

---

## MEMORANDUM OPINION

This case is brought under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA").  The plaintiff, Kimberly Fife, alleges that defendant Cooperative Benefit Administrators, Inc. ("CBA"), wrongfully denied her long term disability ("LTD") benefits allegedly due her under a long term disability plan (the "Plan") provided by her former employer, Cherokee Electric Cooperative ("Cherokee"). (Doc. 1-1, at 3). On January 8, 2013, the plaintiff filed a document entitled "Amended Complaint" which added the National Rural Electric Cooperative Association Group Benefits Program ("NRECA") as a defendant, alleging that "[p]laintiff has long term disability protection through the National Rural Electric

Cooperative Association Group Benefit Plan which is administered by Cooperative Benefit Administrators, Inc." (Doc. 9 at 1).[1]

The case is now before the court on the plaintiff's motion for summary judgment (doc. 36), the defendants' motion for summary judgment (doc. 50), the plaintiff's objection to and motion to strike portions of an affidavit offered in support of the defendants' motion for summary judgment (doc. 55), the plaintiff's objection to and motion to strike certain facts proffered in support of the defendants' motion for summary judgment (doc. 56),[2] and the plaintiff's motion to allow supplemental authority (doc. 62). For the reasons stated herein, the motion to allow supplemental authority will be **GRANTED**; the objection to and motion to strike portions of an

---

[1] Rule 8 of the Federal Rules of Civil Procedure requires a claim for relief to contain:

(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8(a). The original and amended complaints are each six sentences long. If they contain the above items, they do so only barely. This issue has not been raised by the parties and the court raises it here only to note that a much better job of pleading could have been done. For example, although the plaintiff is clearly seeking long term disability benefits, neither version of the complaint states that such benefits have been denied, and/or who denied them.

[2] Document 56 is not referenced as a motion in the court's CM/ECF system.

affidavit offered in support of the defendants' motion for summary judgment will be treated as a objection and will be **SUSTAINED**; the objection to and motion to strike certain facts proffered in support of the defendants' motion for summary judgment will be treated as an objection and will be **SUSTAINED in part** and **OVERRULED in part** as noted herein; the plaintiff's motion for summary judgment will be **DENIED**; and the defendants' motion for summary judgment will be **GRANTED**.

## I.   THE PLAINTIFF'S MOTION TO ALLOW SUPPLEMENTAL AUTHORITY (DOC. 62)[3]

The motion will be **GRANTED**. The court has considered the supplemental authority and argument contained in the motion and the response thereto (doc. 63).

## II.   THE PLAINTIFF'S MOTION TO STRIKE (DOC. 55)

It has long been the law in this circuit that, when deciding a motion for summary judgment, a district court may not consider evidence which could not be reduced to an admissible form at trial. *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). But, until 2010, Rule 56 lacked a formal procedure to challenge such inadmissible evidence. In 2010, the advisory committee added Rule 56(c)(2), which provides:

> A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

---

[3] The document appears in the court file as a "notice." (Doc. 62).

Fed. R. Civ. P. 56(c)(2). Although the plaintiff has styled the motion as a motion to strike, the motion is, in substance, a challenge to the admissibility of the defendants' evidence. Therefore, the court will treat the motion as an objection under Rule 56(c)(2).

The advisory committee's note to Rule 56(c)(2) provides that:

[An] objection [under Rule 56(c)(2)] functions much as an objection at trial . . . . <u>The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.</u>

Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments (emphasis added).

The entirety of the plaintiff's short motion reads:

Plaintiff moves to strike the following:

The following portions of Peter Baxter's affidavit . . . as submitted by CBA and as attached to this Motion:

26. DMS is an independent contractor that provides services to CBA consisting of reviewing CBA's file, investigating an appeal through, among other things, consultation with consulting physicians, and providing recommendations to CBA in connection with plan participant appeals.

28. Consistent with Section 3 (d) of the agreement between DMS and the Plan, DMS provides these services solely in a consultative capacity and without having or exercising any fiduciary or discretionary authority regarding the Plan or plan participants' claims for benefits.

> The contract is in evidence and speaks for itself. Mr. Baxter's characterization of the contract and the relationship of the entities is not admissible. Fife has been denied discovery so Mr. Baxter cannot be deposed.

(Doc. 55 at 1-2). The motion cites no rule of evidence, case, or other authority for why this evidence should be stricken.

This is the <u>second</u> motion to strike Baxter's affidavit that the plaintiff has filed. In the first such motion, which was filed as part of the response to the defendants' motion for summary judgment on the applicable ERISA standard of review, the plaintiff sought to strike the <u>entire</u> affidavit, arguing: "Peter Baxter's affidavit is not included in the claim file and Peter Baxter is not listed on the initial disclosures. Plaintiff objects to adding affidavits to the Administrative Record[.] Defendants are not entitled to supplement the record." (Doc. 30 at 2). In that motion as well, the plaintiff provided no legal support for her argument. The court denied the motion holding that "the issue in the instant motion is not denial of benefits. It is the proper standard of review and whether to consider an alleged conflict of interest in this case. Accordingly, the court may look outside the administrative record." (Doc. 46 at 5).

Now, in response to the <u>instant</u> motion, the defendants explain, and the court agrees, that the affiant's statements relate for the most part only to the capacity in which DMS functions, not the terms of any contract. Of course, as the defendants also

note, the capacity in which DMS functions is only relevant to the determination of the proper standard of review. It has already been determined that the proper standard of review in this case is "arbitrary and capricious." *See*, doc. 46 at 33, 41. "To be admissible[,] evidence must be relevant." *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 629 F.2d 993, 999 (5th Cir. 1980).[4] The defendants, upon whom the burden falls to establish admissibility, fail to show why this evidence might otherwise be relevant.[5] Accordingly, the objection to this evidence will be **SUSTAINED**.

---

[4] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981, as well as all decisions issued after that date by a Unit B panel of the former Fifth Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982); *see also United States v. Schultz*, 565 F.3d 1353, 1361 n.4 (11th Cir. 2009).

[5] In a response equally as short as the plaintiff's motion, the defendants write:

While these facts are relevant to the proper standard of review, the Court has already determined the applicable standard of review. *Fife v. Cooperative Benefit Administrators*, 2013 WL 5519720 (N.D. Ala. Oct. 1, 2013).

Moreover, the court has already decided that DMS was an independent contractor, 2013 WL 5519720 at *6, that DMS acts in a consultative capacity, *id.* at *6-7 and 12, and that the "evidence is overwhelming that DMS did not make the decision" denying Fife's claim, *id.* at *12. Thus, Fife is asking the Court to ignore facts the Court has already found undisputed.

But Fife has no basis for the Court to reconsider it[s] earlier ruling. Instead Fife would need to show an intervening change in controlling law, the existence of new evidence that was not previously available or a clear error or manifest injustice that needs to be corrected through reconsideration. *Busby v. JRHBW Realty, Inc. D/b/a RealtySouth*, 642 F. Supp. 2d 1283, 1286 (N.D. Ala. 2009) (Hopkins, J.). She has made no effort to meet this standard.

(Doc. 61 at 1-2). The court does not see the motion as asking the court to reconsider an earlier ruling. The defendants' response does not explain why the evidence might be relevant.

### III. THE PLAINTIFF'S OBJECTION TO AND MOTION TO STRIKE CERTAIN FACTS PROFFERED IN SUPPORT OF THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 56)

In an undeveloped and unsupported argument, the plaintiff argues first that materials in the administrative record which relate to the plaintiff's condition and ability to work, but which were first considered before remand by this court, should not be considered herein because "[t]he only decision under review is the opinion of the Appeals Committee . . . after the remand by the [c]ourt." (Doc. 56 at 1). This objection is without merit and will be **OVERRULED**.

The plaintiff also objects to any discussion of the plaintiff's respiratory and psychological issues "because Fife claims benefits due to pain, [f]ibromyalgia, and effects of medication." (Doc. 56 at 2). The court agrees that, to some extent, this information is irrelevant. However, as is noted in the summary judgment opinion which follows, some of that information is important to include to make the discussion of the plaintiff's medical history more clear. The objection will be **SUSTAINED in part** and **OVERULLED in part**. The court will note in the opinion where information has been excluded and included and for what reason.

### IV. THE SUMMARY JUDGMENT MOTIONS (DOCS. 36 and 50)

#### A. <u>Standard</u>

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there

is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the

8

entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the

non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955); *Matter of Lanting*, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996). The court will consider each motion independently, and in accordance with the Rule 56 standard. *See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is

unnecessary thereby empowering the court to enter judgment as it sees fit." See WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720, at 327-28 (3d ed. 1998).

**B.    The Plaintiff's Failure To Comply with the Summary Judgment Scheduling Order**

The plaintiff's submissions in support of her motion for summary judgment fail, in <u>many</u> respects, to comply with this court's summary judgment scheduling order. (Doc. 2 at 14-21). Document 36, which is the motion for summary judgment itself, is 48 pages long and is comprised of facts, argument, and in depth discussion of evidence. In addition, the plaintiff has submitted document 38, which is entitled "Plaintiff's Memorandum In Support of Summary Judgment." The length and content of the <u>motion</u> are a clear attempt by the plaintiff to enlarge the number of pages in which she has to argue the issues.[6] The scheduling order allows the submission of "a" brief, not "two" briefs. Document 36 will be **STRICKEN** to the extent that it does anything other than put the court on notice that the plaintiff has filed a motion for summary judgment. Document 48, which is the defendants' response to document 36, will also be **STRICKEN**.

Turning to the plaintiff's actual brief (doc. 38), it too fails to comply with this

---

[6] The defendants have objected to the motion as being in contravention of this court's scheduling order. (Doc. 49 at 6-7).

court's scheduling order. First, it fails to include a table of contents. (See, doc. 2 at 15 ("Briefs that exceed twenty pages must include a table of contents that accurately reflects the organization of the document.")). Second, the court's scheduling order states "[t]he parties' submissions in support of and opposition to summary judgment motions must consist of: (1) a brief containing, in separately identified sections, (i) a statement of allegedly undisputed relevant material facts and (ii) a discussion of relevant legal authorities." (Doc. 2 at 15). It also states that "[a]ll briefs submitted either in support of or opposition to a motion must begin with a statement of allegedly undisputed relevant material facts." (Doc. 2 at 16) (emphasis added). Not only does the plaintiff's brief not begin with the facts, it also includes an eight page introduction which includes facts and argument (doc. 38 at 1-8), a separate statement regarding the ERISA standard of review (doc. 38 at 8), and a separate statement of "issues" which reads like argument (doc. 38 at 9). In its scheduling order the court "reserve[d] the right *sua sponte* to STRIKE any statements of fact or responsive statements that fail to comply with these requirements." (Doc. 2 at 19) (italics in original). In accordance with that provision, pages 1-9 of the plaintiff's initial brief will be **STRICKEN** as in violation of the court's scheduling order. The defendants' response to these sections

(doc. 49 at 7-19) is also **STRICKEN**.[7]

Also in contravention of this court's orders, pages 3-12 (up to the response to the defendants' statement of facts) of the plaintiff's opposition to the defendants' motion for summary judgment (doc. 57) includes additional facts and argument. That portion of document 57 will be **STRICKEN**. Defendants' response to this section (doc. 59 at 7-9) will also be **STRICKEN**.

Finally, the court's scheduling order requires that the statement of facts themselves be "set out in separately numbered paragraphs. Counsel must state facts in clear, unambiguous, simple, declarative sentences. All statements of fact must be supported by specific reference to evidentiary submissions." (Doc. 2 at 16). The facts, as stated by the plaintiff, fail in several cases to follow these guidelines. (See doc. 38 at facts no. 1, 3, 10, 15). However, the court will not strike the plaintiff's facts, but will instead treat each <u>sentence</u> as a separate stated fact and determine whether it is supported by the record.

---

[7] Although the lengths of all briefs exceed what is typically allowed by this court (*see* doc. 2 at 15), on September 12, 2013, this court entered an order which provided:

> The parties may file opening memoranda in support of their Summary Judgment motions that shall not exceed 50 pages in length. Responses to opening memoranda in support of Summary Judgment motions shall also not exceed 50 pages in length. Reply briefs shall not exceed 25 pages in length.

(Doc. 42 at 1). The court applies this order retroactively to the plaintiff's brief in support of her motion for summary judgment.

### C.   Facts

#### 1.   *Kimberly Fife*

Fife was an employee of Cherokee which is a member of the NRECA. Among the services the NRECA provides for its members is a long-term disability plan ("the LTD Plan") which is a self-insured Plan subject to ERISA. CBA, the claims adjuster, is a wholly-owned subsidary of the NRECA. Cherokee offered the LTD Plan to its employees.

The National Rural Electric Cooperative Association Group Benefits Program has an appeals administration agreement with Disability Management Services, Inc. (DMS) to review appeals of LTD claims. DMS, in turn, hired MLS National Medical Evaluation, Inc. to obtain medical record reviewers.[8]

#### 2.   *The NRECA Long Term Disability Plan*

Under the Plan, a participant must be "prevented from performing any or all of the Material and Substantial Duties of [her] Own Occupation due to any accidental bodily injury [or] sickness …." (Doc. 52 at 36, § 2.04). After 24 months, a participant must be "unable to perform any or all of the Material and Substantial Duties of any Gainful Occupation." (*Id.*). "Material and Substantial Duties" are "the essential tasks

---

[8] The plaintiff's fact number 3, proffered in her brief in support of her motion for summary judgment, is merely argument followed by a five page block quotation from the decision of the Appeals Committee. (Doc. 38 at 11-17). The fact will not be included.

of an occupation that cannot reasonably be modified or omitted, not including overtime work." (Doc. 52 at 37, § 2.12). The term "Own Occupation" is defined as

> any similar job that involves Material and Substantial duties of the same general nature as the Participant's regular job at the Participating Cooperative when the disability begins. It does not mean the specific job the Participant is performing for a specific Participating Cooperative or at a specific location.

(Doc. 37 at § 2.15). Further, a claimant seeking disability payment is subject to a "Benefit Waiting Period" -- a 13 week period during which she must demonstrate a "continuous Disability" before benefit payments could commence. (Doc. 52 at 35-36, 42, §§ 2.02, 7.07). Fife sought benefits in September 2010, claiming she could not work as an Accounting – Payroll Clerk.

### 3.  *Fife's Job*

Fife's employer confirmed that her position as an Accounting – Payroll Clerk was "sedentary work." Fife submitted her job description with her initial LTD claim on 9/21/10, which includes:

> The Accounting Clerks'/Staff Accountants' positions are assigned specific responsibilities and may be reassigned at management's discretion. Therefore, the Accounting Clerks/Staff Accountants are placed in charge or a particular accounting function but may be moved if decided upon by management. The specific major accounting areas/functions that may be assigned and reassigned are:
>
> 1. ACCOUNTS PAYABLE – JOB RESPONSIBILITIES

…

## 2. CONSUMER ACCOUNTING – JOB RESPONSIBILITIES

…

## 3. PAYROLL ACCOUNTING – JOB RESPONSIBILITIES

…

## 4. WORK ORDER ACCOUNTING – JOB RESPONSIBILITIES

…

## 5. MATERIAL ACCOUNTING – JOB RESPONSIBILITIES

…

## 6. GENERAL ACCOUNTING – JOB RESPONSIBILITIES

…

## 7. ACCOUNTING/CUSTOMER SERVICE/ENGINEERING – JOB RESPONSIBILITIES

(Doc. 65-17 at 53-57).[9] Fife's employer confirmed her position entailed, among other

things, approximately 7 hours a day of sitting; 1 hour a day of talking; no lifting or

carrying ;"simple grasping" with both hands; but no "firm grasping," no "fine

manipulation" and no "pushing/pulling." (Doc. 36-11 at 7). The Appeals Committee

---

[9] The court realizes that this fact, which was proffered by the plaintiff exactly as it appears, omits the actual job responsibilities under each category. As they were not important enough for the plaintiff to include, the court will not substitute its judgment for the plaintiff's and guess as to which responsibilities should be included here.

16

also found that the plaintiff was "required to occasionally bend, squat[,] and reach."

(Doc. 36-6 at 3).

### 4. *Fife's Medical Treatment Records*[10]

---

[10] Rule 56 requires the court to only consider materials which were cited. Fed. R. Civ. P. 56(c)(3). The plaintiff does not set out the contents of her records, writing only:

4. Fife submitted substantial and convincing evidence of disability including:

Ex. 1: Favorable Social Security Decision 7/2/12 with disability onset of 6/8/10 (NRECA 131-140) and eight medical records on which the SSA Award was based (NRECA 24-130). Ex. 11: Dr. Rainer's, Plaintiff's treating physician, confirmation of disability on 12/3/10 (Ex. 11, NRECA 720-721)

Ex. 12: Medical records of Dr. Rainer, which supported his opinions (Ex. 12, NRECA 851-853), 11/30/09, 2/8/10, 5/19/10, 5/25/10, 6/7/10, 6/16/10, 6/21/10, 7/6/10, 7/27/10, 8/4/10, 8/18/10, 9/20/10 (NRECA 229-264).

Ex. 15: Dr. Chindalore's records for fibromyalgia, osteoarthritis, neck pain 7/21/09, 12/4/09, 3/22/10, and 6/30/10. (Ex. 15, NRECA 265-296)

Ex. 16: Dr. Bowen's records of Birmingham Neurosurgery and Spine Group 4/27/10-5/6/10 showing stenosis C6-7 bilaterally and some stenosis at C5-6. (Ex. 16, NRECA 731-742)

Ex. 17: Report of Medical Record Reviewer by Dr. Mary Beth Scholand (Pulmonologist) of Medical Review Institute of America - 12/15/10 who supported disability on the basis of pain. (Ex. 17, NRECA 713-718)

Ex. 20: Fife appeal to CBA 3/1/11 (NRECA 636-638) with submissions of new evidence from Dr. Alexander 12/3/09 (NRECA 647-653) and updated records from Dr. Conner3 11/24/10, 12/21/10, 1/20/11, 1/25/11, 2/10/11, 2/16/11 (NRECA 282-296) (NRECA 667-676) and MRI results and an explanation that fibromyalgia and osteoarthritis were not included because CBA told her to list only the reason she was out of work that week. Fife explained that her disability was not just the pulmonary issues.

Ex. 29: Fife's second appeal notice 8/24/11 (NRECA 474-482) with a chronological history of relevant medical records including a fall in 11/09, history of back pain, confirmation of fibromyalgia with trigger points on 3/22/10, active

_____

right C7 radiculopathy and C6 disk pathology on 5/18/10, and diagnosis of disabling pain of 6/19/11 by Dr. Conner. (Ex. 29)

Ex. 31: Vocational report by Dr. Crunk confirming total disability. (Ex. 31)

Ex. 34: Cherokee Health Clinic Records Dr. Ranier 11/30/09, 2/8/10, 5/19/10, 5/25/10, 6/7/10, 6/16/10, 6/21/10, 7/6/10, 7/27/10, 8/4/10, 8/18/10, 9/20/10: (NRECA 229-264)

Ex. 36: Dr. Henry Ruiz, neurosurgeon 5/18/10 (NRECA 765-768):

> "Impression: Active right C7 radiculopathy secondary to c6 disk pathology, both degenerative and due to calcification in nature."

Ex. 37: Evaluation by Dr. Henry Born, examining physician for the SSA, confirming of isability. (Ex. 7, NRECA 693-697; Ex. 37, NRECA 693-697)

Ex. 38: Dr. Connor's records at Pain & Wound Care Center for fibromyalgia, neck and hip pain with herniated disc in neck 8/8/10-4/17/12: (Ex. 38, NRECA 302-307, 310-315, 318-348, 356-358, 364, 370-371, 374-375, 380-381, 385-387, 389-398)

Ex. 40: MRI's of 4/27/10, Cherokee Health Clinic. (NRECA 163-174)

(Doc. 38 at 6-8). She has technically "cited" this evidence. However, this technique basically just alleges that, somewhere in these records, there is medical and vocational evidence which supports her claim. She puts the onus on the court to "dig it up" on her behalf. Literally hundreds of pages of records have been cited without any explanation as to which portions of what records constitute "substantial and convincing evidence of disability." The plaintiff might have just as well have cited to "the court file" generally. Still, the court has made an effort to review and summarize here the key portions of the records cited by the parties. However, the court cannot be faulted for failing to consider some aspect of those records upon which the plaintiff relies but which she failed to specify. "'There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments.'" *McIntyre v. Eckerd Corp.*, 251 F. App'x 621, 626 (11th Cir. 2007) (*quoting Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995). The court also notes that the plaintiff's counsel refers to a summary of medical records that he prepared. (Doc. 38 at 7-8 (citing 65-10 at 4-12)). The court <u>has not</u> considered this summary as it is only counsel's opinion as to what the records say.

### a.    Fife's Regular Treating Physicians[11]

Fife's complaints of fibromyalgia and neck/back pain were supported primarily by records from her treating physicians: Dr. Vishala L. Chindalore, a Rheumatologist at Anniston Medical Clinic, Dr. Ryan Rainer at Cherokee Health Clinic, and Dr. Odene H. Connor at the Pain and Wound Care Clinic.[12]

### (1)    Dr. Vishala L. Chindalore, M.D.

Dr. Chindalore frequently noted the plaintiff's complaints of pain and her diagnosis of fibromyalgia. (Doc. 65-1 at 27 (January 23, 2009), 32 (March 16, 2009); 32-33 (April 24, 2009); 33 (July 21, 2009); 34 (December 21, 2009); and 37 (June 30, 2010)). But he also frequently noted that Fife had good range of motion: "Both the hands, wrists, elbows, shoulders, ankles, knees and hips have good range of motion without any effusions." (Doc. 65-1 at 27 (January 23, 2009); 32-33 (April 24, 2009); at 33 (July 21, 2009); 34, 37 (March 22, 2010); and 37 (June 30, 2010)). Dr.

_____

[11] The plaintiff was originally evaluated for a number of alleged disabilities, including respiratory and psychological issues. As noted previously, the plaintiff has abandoned all arguments that she is disabled for these reasons. Accordingly, the court will omit from these facts any discussion of those records or issues.

[12] This fact was offered by the defendants and admitted by the plaintiff. However, in addition to admitting the fact, the plaintiff includes argument and additional facts. The court's summary judgment scheduling order provides that the opponent's response to the movant's facts "must consist of only the non-moving party's disputes, if any, with the moving party's claimed undisputed facts." (Doc. 2 at 17). Because the additional material is presented in violation of the court's order, it, and all other such material which appears in the plaintiff's response, will be **STRICKEN**.

Chindalore reported numerous times that Fife's "[l]ow back appears benign." (Doc. 65-1 at 27 (January 23, 2009), 32 (March 16, 2009); 32-33 (April 24, 2009); 33 (July 21, 2009); 34 (December 21, 2009); and 37 (June 30, 2010)). Fife's lumbosacral "spine flexion" was consistently "within normal limits." (Doc. 65-1 at 27 (January 23, 2009), 32 (March 16, 2009); 32-33 (April 24, 2009); 33 (July 21, 2009); 34 (December 21, 2009); and 37 (June 30, 2010)).

Dr. Chindalore consistently noted that Fife's "[g]ait is normal." (Doc. 65-1 at 27 (January 23, 2009), 32 (March 16, 2009); 32-33 (April 24, 2009); 33 (July 21, 2009); 34 (December 21, 2009); and 37 (June 30, 2010)). Dr. Chindalore also consistently noted that Fife had "[n]o myopathy or radiculopathy." (Doc. 65-1 at 27 (January 23, 2009), 32 (March 16, 2009); 32-33 (April 24, 2009); 33 (July 21, 2009); 34 (December 21, 2009); and 37 (June 30, 2010)). Fife had "[n]o vasculitic lesions."(Doc. 65-1 at 27 (January 23, 2009), 32 (March 16, 2009); 32-33 (April 24, 2009); 33 (July 21, 2009); 34 (December 21, 2009); and 37 (June 30, 2010)). Dr. Chindalore frequently noted that Fife's neck was "supple with good C-spine range of motion." (Doc. 65-1 at 32 (March 16, 2009); 32-33 (April 24, 2009); 33 (July 21, 2009); 34 (December 21, 2009)). On April 24, 2009, Dr. Chindalore noted that "[s]he had a lot of joint pains last time. Toradol helped her a lot." (Doc. 65-1 at 32). On March 22, 2010, he noted that "[s]he is doing reasonably well on current therapy."

(Doc. 65-1 at 34). Only on December 21, 2009, did Dr. Chindalore indicate that all of the fibromyalgia "trigger points" were positive. (Doc. 65-1 at 34). Other times, both before and after that date, Dr. Chindalore noted only that "some" or "a few" of the trigger points were positive. (Doc. 65-1 at 27 (January 23, 2009), 32 (March 16, 2009); 32-33 (April 24, 2009); 33 (July 21, 2009); and 37 (June 30, 2010)). She was a "no show" for her October 2010 appointment with Dr. Chindalore. (Doc. 65-12 at 27).

### (2)   Dr. Ryan Rainer, M.D.

On August 13, 2009, the plaintiff presented to Dr. Rainer complaining of "diarrhea and abdominal cramping for 2 days," along with "obesity." (Doc. 65-17 at 3).

On November 30, 2009, the plaintiff presented to Dr. Rainer complaining of "low back and left sciatic pain of 4 days duration without lateralizing deficits but with spasm and tenderness to palpation." (Doc. 65-17 at 2). On exam it was noted that the plaintiff had "[t]enderness to palpation over left sciatic notch and lower lumbar area without deficits." (Doc. 65-17 at 2). Dr. Rainer's impression was "[l]eft sciatica/[l]ow back pain. (Doc. 65-17 at 2). His plan was to treat the plaintiff with medications. The record is difficult to read, but it appears that one of those medications was Percocet. (Doc. 65-17 at 2).

The plaintiff next saw Dr. Rainer on February 8, 2010, with complaints of "bilateral ear and intermittent hip pain." (Doc. 65-17 at 1). Dr. Rainer's impression was "BOM/Bilateral hip pain," and his plan was to treat her with medications. (Doc. 65-17 at 1). The names of the medications are unclear from the record.

The record reflects the following visits to Dr. Rainer solely for respiratory issues:[13]

– February 22, 2010 – cough and left ear pain for several days and myalgias (doc. 65-16 at 41); "impression/plan" was "Myalgias/LOM/Cough" and he planned to treat the plaintiff with medications "along with symptomatic treatment" (doc. 65-16 at 41);

– May 19, 2010 – cough and congestion (doc. 65-16 at 39-40);

– May 25, 2010 – congestion; prescribed Depo-Medrol and IM Rocephin (doc. 65-16 at 37-38);

– June 7, 2010 – "congestion and [a] cough;" prescribed Bicillin (doc. 65-16 at 35-36);

– June 16, 2010 – "coughing and congested" (doc. 65-16 at 33);

– June 21, 2010 – admitted to the hospital for bronchitis/bronchial spasms.

---

[13] Because the plaintiff has cited to nearly all of Dr. Rainer's records generally, the court includes this discussion even though any disability claim based upon this ailment has been abandoned.

(doc. 65-16 at 30-32);

– July 6, 2010 – respiratory symptoms including "side pain, wheezing [and] .
. . "coughing" (doc. 65-16 at 28); assessment was "Chronic
Bronchitis/Bronchialspams" and "Pleurisy" (doc. 65-16 at 29); prescribed
medications for her conditions and referred to a pulmonologist (doc. 65-16 at
29);

– July 27, 2010 – respiratory issues and migraine headaches (doc. 65-16 at 26);
assessed as having "Migraines, Sinusitis, and Asthma" (doc. 65-16 at 27);
asthma noted to be stable and medications prescribed for her other conditions
(doc. 65-16 at 27); and

– August 4, 2010 – coughing and shortness of breath (doc. 65-16 at 25);
assessment was "Bronchitis/Asthma" (doc. 65-16 at 25); prescribed
medications and referred to Dr. Grubbe (allergist). (Doc. 65-16 at 25); note
indicated that plaintiff did not feel that she could return to work due to
coughing and shortness of breath; advised to remain out of work.

Dr. Rainer does not begin to note pain issues with the plaintiff until an August
18, 2010, visit. Even then, the plaintiff only complained to Dr. Rainer about having
a cough. (Doc. 65-16 at 22). She stated to Dr. Rainer that she was "scared to go back
to work now because her job is demanding and she doesn't feel she can do it currently

. . . . feels beat down right now." (Doc. 65-16 at 22). She noted that she had seen Dr. Grubbe for her respiratory issues. (Doc. 65-16 at 22). Dr. Rainer noted that the plaintiff had seen Dr. Connor that same morning for neck pain and Dr. Connor had prescribed Percocet and Lidocane patches. (Doc. 65-16 at 22). Dr. Rainer's assessment was she had "neck pain, asthma, and Allergic Rhinitis." (Doc. 65-16 at 23). His plan was for her to continue her current medications and see her specialists. (Doc. 65-16 at 23).

Dr. Rainer saw the plaintiff on September 20, 2010, for a check up. (Doc. 65-16 at 20). Her chief complaint on that visit concerned symptoms regarding her asthma. (Doc. 65-16 at 20). Although she also complained of "neck pain," Dr. Rainer noted that she was "seeing Dr. Connor for pain management," that it was "going well," and the her "TENS unit helps a lot." (Doc. 65-16 at 20). Dr. Rainer's assessment was:

> Asthma, Allergic Rhinitis, possible sarcoidosis > undergoing evaluation at UAB allergy shot today.
>
> Neck pain; back pain – seeing Dr. Connor

(Doc. 65-16 at 21).

On December 3, 2010, Dr. Rainer completed a form entitled "Long Term Disability Benefits Claim – Attending Physician's Statement of Disability." (Doc. 65-

24

14 at 8-9).[14] Dr. Rainer noted that the plaintiff:

– ceased work in June of 2010;

– had a primary diagnosis of "Rheumatoid Arthritis," with a secondary diagnosis of "Lung manifestations [of Acute Respiratory Acidosis], Asthma" (doc. 65-14 at 8);

– had the subjective symptoms of "severe joint pain, severe neck pain, severe fatigue, [and] severe dyspnea" (doc. 65-14 at 8);

– had objective findings which included "[a]bnormal joints on exam, [g]eneral debility worsening over 6 months, [w]orsening lung function over 6 months" (doc. 65-14 at 8);

– had the following diagnostic tests performed "[a]bnormal pulmonary function tests, abnormal allergy testing" (doc. 65-14 at 8);

– could lift/carry less than 10 pounds occasionally; has sustained tolerance to sit for 2 hours, stand for 1 hour, and walk for 1 hour; could not use her extremities for simple grasping, pushing and pulling, or fine manipulations; was not able to climb, bend/stoop, kneel, crouch, crawl, handle, or finger; could occasionally balance between 0 - 2.5 hours per day; could occasionally

---

[14] In its March 20, 2013, decision, the Appeals Committee noted that an earlier form, dated September 23, 2010, had been completed by Dr. Rainer. (Doc. 36-6 at 3). The parties have not cited the court to that form, and the court has been unable to find it in the record.

reach above her shoulder between 0 - 2.5 hours per day (doc. 65-14 at 8); and

– had <u>not</u> reached maximum medical improvement (doc. 65-14 at 8).

### (3)    Dr. Odene H. Connor, M.D.

The plaintiff was initially assessed at the Pain and Wound Care Center on August 18, 2010. (Doc. 65-5 at 25). It was noted that she had had pain for "7-8 years," and that she had "a herniated disc in [her] neck," "a lot of joint pain especially in her hips," and that she "complains of low back pain [which] can come in gradually." (Doc. 65-5 at 25). Dr. Connor also noted that the plaintiff has fibromyalgia. (Doc. 65-5 at 27). Dr. Connor noted only "moderately decreased" range of motion in the plaintiff's cervical and lumbar spine, while measuring strength in all extremities at a 4/5 level. (Doc. 65-5 at 26). These same results were noted in exams on September 1, 2010 (doc. 65-5 at 35), September 28, 2010 (doc. 65-5 at 38), October 27, 2010 (doc. 65-5 at 41), November 24, 2010 (Doc. 65-6 at 3), December 21, 2010 (doc. 65-6 at 9), January 25, 2011 (doc. 13), February 16, 2011 (doc. 65-6 at 16), March 16, 2011 (doc. 65-6 at 23), April 28, 2011 (doc. 65-6 at 25), May 24, 2011 (doc. 65-6 at 27), June 20, 2011 (doc. 65-6 at 31), July 19, 2011 (doc. 65-6 at 33), August 10, 2011 (doc. 65-6 at 35), September 26, 2011 (doc. 65-7 at 50), October 26, 2011 (doc. 65-8 at 4), November 22, 2011 (doc. 65-8 at 10), January 19, 2012 (doc. 65-8 at 15), February 23, 2012 (doc. 65-8 at 23), March 22, 2012 (doc. 65-

26

8 at 25), April 17, 2012 (doc. 65-8 at 27). At some point, Dr. Connor prescribed a lumbar back brace to assist with thoracic and lumbar back pain, a cervical collar to assist with a cervical radiculopathy, and a TENS unit for pain relief.[15]

Dr. Connor requested a cervical MRI without contrast which occurred on February 10, 2011. (Doc. 65-7 at 35). The report noted: "Very small broad-based subligamentous bulge at C6-7 causing mild impression upon on the ventral thecal sac but no significant spinal canal stenosis." (Doc. 65-7 at 35). Also at Dr. Connor's request, an MRI of plaintiff's lumbar spine was performed that same day which found no evidence of disc bulge, spinal canal stenosis or foraminal narrowing but noted a right-sided pseudomeningocele at L4 and L5 with questionable right S1 pseudomeningocele. (Doc. 65-7 at 36).

A September 27, 2010, "Electrodiagnostic Report" from Dr. Connor also appears in the record. In that report, Dr. Connor includes a presumptive diagnosis of "[c]ervical plexopathy without motor deficit." (Doc. 65-7 at 43). A January 20, 2011, "Electrodiagnostic Report" from Dr. Connor also appears in the record. In that report, Dr. Connor includes a presumptive diagnosis of "[l]umbosacral plexopathy without

---

[15] The fact that Dr. Connor prescribed these items is undisputed. The Appeals Committee wrote that they were prescribed on September 1, 2010. (Doc. 36-6 at 6). Most of what Dr. Connor wrote is illegible to the court. Accordingly, it cannot verify the date upon which these items were prescribed.

motor deficit." (Doc. 65-6 at 10). A February 21, 2012, "Electrodiagnostic Report" from Dr. Connor includes a presumptive diagnosis of "cervical plexopathy without motor deficit." (Doc. 65-8 at 18).[16]

### b.    Other Tests

An April 27, 2010 cervical spine MRI described the abnormalities as: "Early spondylotic and degenerative changes C6 with associated spur and/or bar formation and concurrent mild broad-based bulging of the C6 intervertebral disc." (Doc. 65-14 at 80).

---

[16] The plaintiff's counsel prepared a summary of her medical records. (Doc. 65-10 at 4-12). Although the court does not consider this "summary" to be evidence in the case, it notes that plaintiff's counsel has stated that Dr. Connor made the following "clinical assessment of pain" on June 19, 2011:

(1). Pain is present to such an extent as to be distracting to adequate performance of daily activities or work. (2). Physical activity greatly increases pain to such a degree as to cause distraction from task or total abandonment. (3). Medications which are prescribed can be expected to impact patient with significant side effects which may limit the effectiveness of work duties or the performance of everyday tasks. (4). Pain and/or drug side effects can be expected to be severe and to limit effectiveness due to distraction, inattention, drowsiness, etc. (5) Long term prospects for recovery in regard to pain will remain a significant element in this person's life. (6) Treatments for pain have had no appreciable effect or have only briefly altered the level of pain this patient experiences.

(Doc. 65-10 at 7). If Dr. Connor's statement appears in the record somewhere other than in this summary, it has not been cited by the parties and the court has not been able to find it. This "summary," which is not evidence, cannot and will not be considered by the court. The court has found where a disability questionnaire was forwarded to Dr. Connor, in response to which someone in his office replied "Dr. Connor does not fill out [d]isability forms." (Doc. 65-13 at 5).

### c.    Clay Alexander, D.C.

The plaintiff first saw Clay Alexander, a chiropractor, on January 23, 2009, where it was noted that the plaintiff had "[a] headache, neck pain, mid back pain." (Doc. 65-12 at 22). She visited Alexander's office with similar complaints of pain on:

– December 3, 2009 – "slipped on ramp . . . jerked low back [and] since then low back pain has become worse with mid back pain" (doc. 65-12 at 21):

– December 7, 2009 – "still has pain in mid back and low back worse on standing or walking" (doc. 65-12 at 20):

– December 28, 2009 – "pain in lower back into left hip and left leg . . . [p]atient states she has had shingles . . . mid back soreness" (doc. 65-12 at 19);

– December 29, 2009 – "severe palpatory tenderness along left sciatic nerve in buttock and left hip . . . suspected post herpatic pain" (doc. 65-12 at 18); and

– October 21, 2010 – "neck and mid back pain;" stated that "she has been out of work due to lung disorders and has been coughing a lot" (doc. 65-12 at 16-17).[17]

---

[17] The record reflects an additional visit (doc. 65-12 at 17), but the date of that visit is unreadable. Further, the record appears to be only a treatment note without much additional information. The defendants proffer: "34. Dr. Alexander's records also suggest a considerable gap in chiropractic treatment (presumably for alleged pain and orthopedic problems) from December 2009 to October 2010 [Exh. F at 95 - 96]." This is argument and will not be included.

### d.   Dr. Henry Ruiz, M.D.

On May 18, 2010, the plaintiff was seen by Dr. Ruiz at the Ruiz Neurosurgery Clinic. (Doc. 65-14 at 53). She complained of a "12-14 month history of mechanical cervical pain." (Doc. 65-14 at 53). She also complained of lumbar pain, but stated that the cervical pain was "definitely worse." (Doc. 65-14 at 53). Dr. Ruiz noted that the April 27, 2010, MRI "reveals an extruded and partially calcified C6 disk with an indention on the ventral portion of the thecal sac. There is a small, clinically unimportant spondylitic spur at C5." (Doc. 65-14 at 53). His impression was "Active right C7 radiculopathy secondary to C6 disk pathology, both degenerative and due to calcification in nature." (Doc. 65-14 at 54). He scheduled the plaintiff for an anterior cervical discectomy and fusion on June 23, 2010. (Doc. 65-14 at 54). The record does not indicate if the procedure was actually performed.

### e.   Dr. Henry Born, M.D.

Fife was also examined for her claim for SSDI benefits by Dr. Born, a family practitioner. Dr. Born noted that the plaintiff complained "of numerous aches, pains, and muscular problems." (Doc. 65-13 at 22). Dr. Born did not opine that Fife was disabled, but noted a number of conditions that were either diagnosed or "probable." (Doc. 65-13 at 24). Dr. Born documented that, on exam, the plaintiff had intact muscle strength with no atrophy. (Doc. 65-13 at 23). She had "normal grip strength

and normal finger/hand dexterity bilaterally." (Doc. 65-13 at 23). Dr. Born noted that the plaintiff "complain[ed] of weakness in all her muscles, but we do not see any atrophy and there is more of a subjective sensation of weakness than any real muscle atrophy or weakness." (Doc. 65-13 at 23). His exam showed intact muscle strength in the lower extremities as well. (Doc. 65-13 at 23). The plaintiff had no distress in her gait which Dr. Born described as "very good." (Doc. 65-13 at 23). He described her as being able to "move the neck fairly well."  (Doc. 65-13 at 24). Despite point tenderness, he noted that the plaintiff "is moving actually pretty well." (Doc. 65-13 at 24). Examination of the shoulders, elbows, wrists, hands, and fingers revealed "normal range of motion" with "generalized tenderness." (Doc. 65-13 at 24). He also noted that "[e]verything seems to hurt, but there are no localizing findings." (Doc. 65-13 at 24).  At the hips, knees, ankles, and feet, Dr. Born noted "no pain, no swelling, no tenderness, and no bogginess." (Doc. 65-13 at 24). Dr. Born noted that the plaintiff's "gait is only minimally slow. We asked the [plaintiff] to walk on her toes and heels and she does this fairly well. . . . We also asked the [plaintiff] to squat and arise and we can get her to do this too[.]" (Doc. 65-13 at 24). He noted that the plaintiff reported that she might have neck surgery, but that while "the CT scans of the neck [show] some abnormalities . . . it does not appear that there is anything that would warrant an operation at this time." (Doc. 65-13 at 24).

31

Dr. Born did note that the plaintiff had "point tenderness" on examination of the lumbosacral spine, and "pain on range of motion here and pain on straight leg raising at 60 degrees without radiation." (Doc. 65-13 at 24). His impression was: 1) fibromyalgia, 2) probable degenerative arthritis, 3) possible early rheumatoid arthritis, 4) degenerative arthritis, cervical spine and lumbosacral spine, 5) depression, and 6) recurrent asthma. (Doc. 65-13 at 24). He described her symptoms as "chronic" and stated that it is quite likely that they will persist. (Doc. 65-13 at 24).

### f.      William A. Crunk, PhD, CRC

Crunk evaluated Fife on October 24, 2011. (Doc. 65-9 at 29). Crunk's letter reflects that he interviewed the plaintiff, and also reviewed medical records from Dr. Henry Ruiz, Dr. Henry Born, and Dr. Connor. (Doc. 65-9 at 30).[18] He then opined that "[s]he would be considered totally disabled as it related to work." (Doc. 65-9 at 30).

### g.      Dr. Samuel R. Bowen, II, M.D.

On November 17, 2010, the plaintiff saw Dr. Bowen at Birmingham Neurosurgery Group. (Doc. 65-14 at 20). The plaintiff complained of "a history of neck pain and right arm pain . . . severe over the last three weeks. She also complains

---

[18] Crunk noted the aforementioned evaluation by Dr. Connor, which has not been cited to nor found by the court (*see* n. 16, *supra*), where he says Dr. Connor noted that her pain "would disable her from work," and "was so intense that it would be distracting to adequately perform her daily activity and would cause distraction from tasks or total abandonment of a work setting." (Doc. 65-9 at 30).

of numbness in the 4th and 5th digits of the right hand." (Doc. 65-14 at 20). Dr. Bowen noted "[c]omplaints of joint pain, leg cramps, thoracic pain, cervical pain, [r]ight [a]rm (burning, aching, numbness, tingling, weakness); [r]ight [l]eg (numbness, tingling, sharp shooting); [l]eft [l]eg (aching, numbness)." (Doc. 65-14 at 21). Dr. Bowen reviewed the April 27, 2010, MRI of the plaintiff and found that it showed "stenosis 6-7 bilaterally and some at C5-6 more to the left." (Doc. 65-14 at 22). He noted normal gait, posture, and strength in the upper and lower extremities. (Doc. 65-14 at 24). He opined that he "do[es] think that she has [cervical] stenosis and problems form this." (Doc. 65-14 at 25). He ordered a myelogram and wanted the plaintiff to follow up thereafter. There is no indication that the myelogram was performed, and there are no further records from Dr. Bowen.

### h.    Dr. Mary Beth Scholand, M.D.

Dr. Scholand is a pulmonologist affiliated with Medical Review Institute of America, Inc. She reviewed Fife's records and wrote:

> During the phone conversation with Dr. Connor, [she] stated the patient suffers primarily from her fibromyalgia. The MRI from 4/10 was reviewed, which described the disc bulge. Her EMG has mild abnormalities in C5, C6 and C8. Per her pain physician, her position as an accountant doing word processing with a bent neck will exacerbate this mild radicular pain.

(Doc. 65-14 at 2).  Dr. Scholand also noted that: "[T]here is no evidence to support

pulmonary functional impairment in this patient." (Doc. 65-14 at 4). There is no indication that Dr. Scholand spoke with Dr. Rainer.

Dr. Scholand stated that "after review it appears the [plaintiff] has an established diagnosis of fibromyalgia and cervical osteoarthritis with bone spurs and disc bulge that causes radicular pain that might be exacerbated by the specific duties of her job." (Doc. 65-14 at 3). She noted that "[t]he chart includes documentation of rheumatoid arthritis and sarcoid, both of which the [plaintiff] does not have." (Doc. 65-14 at 4). She also wrote: "Based on review of the documents and discussion with the treating physicians, the diagnoses of fibromyalgia, cervical stenosis/cervical radiculopathy and allergies are supported." (Doc. 65-14 at 4). Dr. Scholand was specifically asked if there was medical evidence to support functional impairment, to which she answered: "There is no evidence to support pulmonary functional impairment." (Doc. 65-14). She did not address the question as to the plaintiff's other issues.   Dr. Scholand herself opined only that her radicular pain "might be exacerbated by the specific duties of her job." (Doc. 65-14 at 3) (emphasis added).

### i.    Dr. Paul Lafavore, M.D.

Dr. Lafavore, who is Board Certified in Anesthesiology and Pain Medicine, also reviewed Fife's records. (Doc. 65-13 at 37-41). He noted that the plaintiff's "pain related issues . . . are primarily and confined to the [plaintiff's] cervical pain." (Doc.

34

65-13 at 38). While he saw some objective evidence of abnormalities in Fife's cervical spine, he found no disabling orthopedic condition:

> There are a few records pertaining to neck pain and treatment. No conclusions can be made based on records reviewed that functional impairment and/or limitations are present…. It cannot be said that impairments/restrictions are present based on available data reviewed in this case.

(Doc. 65-13 at 38-39). Dr. Lafavore also found that "[t]here is insufficient evidence presented to definitively support fibromyalgia." (Doc. 65-13 at 39). He found "no impairing pain conditions based on the records reviewed." (Doc. 65-13 at 39). He also noted that: "There [is] insufficient medical evidence to support functional impairment as related to cervical spinal stenosis and/or fibromyalgia." (Doc. 65-13 at 39). He stated that "[o]bjective testing" which "would include a functional capacity examination," "may define [the plaintiff's] limitations." (Doc. 65-13 at 39).

### j.    Dr. Richard Kaplan, M.D.

On March 1, 2011, Fife appealed the denial of her claim.[19] CBA retained Disability Management Services, Inc. ("DMS") to assist in reviewing Fife's appeal.[20]

---

[19] In her brief in support of her motion for summary judgment, the plaintiff proffered fact number 10, which, in large part, consists of a block quote without a citation. This fact has not been included.

[20] This fact, offered by the defendants, is disputed by the plaintiff, who argues that "CBA was under contract with DMS to review and decide appeals." (Doc. 57 at 18). This court has already considered this argument and held that "[t]he evidence is overwhelming that DMS did not make the decision." (Doc. 46 at 27).

DMS, in turn, arranged to have Fife's records reviewed by Dr. Richard Kaplan, a physician who is Board Certified in Physical Medicine and Rehabilitation.[21]

Dr. Kaplan reviewed Fife's allegations of orthopedic and pain-related limitations. Dr. Kaplan noted that "[n]umerous medical records in the file are handwritten and illegible to this reviewer." (Doc. 65-10 at 51). Later in his report, Dr. Kaplan identifies the specific records as those from Dr. Connor at the Pain and Wound Care Center, and from Clay Alexander. (Doc. 65-10 at 53).

Dr. Kaplan acknowledged that Fife had certain orthopedic issues, but found the medical evidence demonstrated that she could work, noting, for example, that "multiple physical examinations and radiographic findings demonstrate excellent retained physical ability." (Doc. 65-10 at 56). His report reflects that he attempted to speak, without success, with Drs. Alexander, Dransfield, Connor, Grubbe, Bowen, and Chindalore. (Doc. 65-10 at 53-55). Dr. Kaplan did interview Dr. Rainer on May 2, 2011, and summarized their conversation in a letter (which Dr. Rainer acknowledged in writing) that noted: "[Dr. Rainer] feels that due to the claimant's overall joint pain, fatigue, and dyspnea, she would not be able to work at any job other than a solely sedentary job. Dr. Rainer feels that she likely could do a sedentary

---

[21] Dr. Leonard Cosmo, M.D., a pulmonologist, was also asked to review the records. Because the plaintiff is not claiming disability based on her pulmonary functions, Dr. Cosmo's opinion will not be included.

sitting job but the claimant perceives she is not able to do that….” (Doc. 65-11 at 21).

Notably, Dr. Kaplan also took into account Fife’s fibromyalgia diagnosis, including Dr. Chindalore’s December 2009, records which noted “positive flbromyalgia trigger points [and] painful range of motion” but also noted “normal gait and no myelopathy or radiculopathy.” (Doc. 65-10 at 51). Dr. Kaplan noted that Dr. Chindalore diagnosed the plaintiff with “a flare up of arthralgias and myalgias as well as a chronic pain syndrome treated with Loricet and stable back pain, leg pain[,] and myalgias.” (Doc. 65-10 at 51).

Dr. Kaplan also noted how Dr. Chindalore’s March 22, 2010, records confirmed that Fife’s “hands, wrists, shoulders, elbows, ankles, knees, and hips had good range of motion without any effusion,” that her “low back appeared benign,” her spine “demonstrated flexion within normal limits,” and that her “gait was normal.” (Doc. 65-10 at 51-52). Dr. Kaplan noted that Dr. Chindalore thought the plaintiff was doing reasonably well on her current therapy, but with continued pain in her neck and back. (Doc. 36-6 at 7). Dr. Kaplan also noted that Dr. Chaindalore described the April 27, 2010, MRI as “demonstrating early spondylitic and degenerative changes at multiple levels with no specific focal neurological deficits.” (Doc. 65-10 at 52).

Dr. Kaplan also noted that, on May 6, 2010, the plaintiff had a neurosurgery evaluation by Dr. Bowen where she complained of “neck pain and right arm pain

which was severe for several weeks with associated numbness in the 4th and 5th digits of the right hand." (Doc. 65-10 at 52). Dr. Kaplan noted that Dr. Bowen described "normal range of motion of all joints and with no deformity," a "normal cognitive examination," a "detailed motor neurological examination" that was "within normal limits," normal gait and an absence of paraspinal muscle spasm. (Doc. 65-10 at 52).

Dr. Kaplan also cited the May 18, 2010, neurosurgical evaluation done by Dr. Ruiz where Dr. Ruiz

> felt that claimant had subtle 4/5 weakness in the right triceps and flexors of the wrist as well as absent triceps reflex. Overall Dr. Ruiz felt that based on the claimant's MRI and physical examination that she had an active right C7 radiculopathy due to C6 pathology. He recommended a C6 anterior cervical discectomy and fusion.

(Doc. 65-10 at 52).

Dr. Kaplan noted that Dr. Connor has prescribed a back brace, cervical collar and TENS unit. (Doc. 65-10 at 53). Dr. Kaplan commented that the February 10, 2011, MRI "demonstrated a right-sided pseudomeningocele at L4 and L5 with a questionable right S1 pseudomeningocele. No spinal stenosis was identified. No disc bulge or spinal canal stenosis or foraminal narrowing was identified." (Doc. 65-10 at 53).

Dr. Kaplan noted that Dr. Gaunzra, a rheumatologust, "wrote a narrative report

opining the claimant has the diagnosis of fibromyalgia versus less likely inflammatory arthritis. No erosive disease was identified on plain films of the hand." (Doc. 65-10 at 53).

He noted that "multiple physical examinations and radiographic findings demonstrate excellent retained physical ability." (Doc. 65-10 at 56) (emphasis added). Ultimately, Dr. Kaplan concluded that:

> From a physical medicine and rehabilitation perspective, the medical evidence does not support a musculoskeletal condition or conditions that would support impairment for a sedentary occupation. Rather, the records outline proposed diagnoses and retained physical abilities such that continuation of a sedentary occupation would not only be possible but likely therapeutic for this claimant.

(Doc. 65-10 at 57). In support of this conclusion, Dr. Kaplan noted:

> She has been diagnosed with fibromyalgia though with very limited objective impairing factors. For example, on 7/21/09 Dr. Chindalore noted that the claimant had good range of motion of the hands, wrists, elbows, shoulders, ankles, knees and hips without any effusion and her low back exam was benign and her lumbosacral flexion was normal. She had no evidence of myopathy and radiculopathy on examination and no vasculitic lesions.

(Doc. 65-10 at 56). He also noted that the April 27, 2010, MRI "demonstrated early spondylitic and degenerative changes." (Doc. 65-10 at 56).

### k.    Fife's SSDI Award

After Fife filed this lawsuit, the parties agreed to a remand for review of Fife's

July 2, 2012, award of SSDI benefits. Fife was awarded SSDI benefits based on the ALJ's conclusion that she was disabled by orthopedic issues, arthritis, fibromyalgia, asthma, and depression. (Doc. 65-2 at 52-60). Yet the ALJ also found that Fife "has the residual functional capacity to perform a significant range of light work as defined in 20 C.F.R. § 404.14567(b) except the claimant has distracting pain that is increased with physical activity to the abandonment of tasks, and medication side effects that limit effectiveness due to distraction, inattention, drowsiness, etc." (Doc. 65-2 at 58). In the decision, the ALJ noted that "[g]reater weight is given to the treating source records than the reports of the non-examining, reviewing sources at the State agency …." (Doc. 65-2 at 59). 71. The ALJ noted that "[m]edical improvement is expected, with appropriate treatment," and noted the need for another review in 18 months. (Doc. 65-2 at 60). The ALJ did not have, and therefore could not consider, certain evidence found in the administrative record here, including the opinions of Drs. Scholand, Lafavore, Cosmo, Kaplan, Litow, and Goldman, and the statements by two of Fife's treating physicians, Drs. Grubbe and Rainer.

### l.   Dr. Francesca Litow, M.D.

The SSDI decision and other information Fife's counsel provided was reviewed in early 2013 in a court-approved remand. In that review, the Appeal Committee considered all of the evidence cited above including a new medical opinion from Dr.

Francesca Litow, who is board certified in occupational medicine.[22]

Regarding Fife's complaints of pain, Dr. Litow noted that Fife had a variety of complaints, but found her "conditions were noted to be chronic and stable." (Doc. 65 at 35).[23] When asked whether Fife had any physical conditions that were functionally impairing, Dr. Litow found "no physical conditions supported by the clinical evidence that are functionally impairing." (Doc. 65 at 37). To support this conclusion, Dr. Litow noted:

– contemporaneous records of a May 6, 2010, physical examination by Dr. Bowen documented normal upper extremity strength (doc. 65 at 36, 38-39);

– the April 27, 2010 MRI findings were "consistent with mild degenerative disc disease of the cervical spine" (doc. 65 at 38);

– the physical examination documented by Dr. Born on February 23, 2011 , which documented a decreased range of motion in Fife's cervical and lumbar spine, but also documented normal upper and lower extremity strength (with

_____

[22] The Appeals Committee also asked Dr. Marcus Goldman, a board certified psychiatrist, to review the plaintiff's potential psychological issues. Dr. Goldman's evaluation is not relevant here.

[23] The defendants proffer: "Dr. Litow's conclusion about the chronic and stable nature of Fife's complaints is supported by, among other things, treatment for fibromyalgia by Dr. Chindalore dating back at least to 2004 [Exh. F at 691], Fife's allegation that she was diagnosed with fibromyalgia as early as 2001 [Exh. F at 637], and several years of chiropractic records which demonstrated that Fife had previously been able to work despite similar complaints of pain. [Exh. F at 47-96]. (Doc. 51 at 23). This statement is argument and will not be included.

no atrophy in extremity muscles), normal sensory exam, normal reflexes, and normal gait (doc. 65 at 38); and

– the medical records from Dr. Connor, ranging in dates from August 18, 2010 through April 17, 2012, consistently noted only a moderate decrease in cervical range of motion while measuring strength in all extremities at a 4/5 level (doc. 65 at 37).[24]

Dr. Litow found no evidence of side effects from the plaintiff's medications. (Doc. 65 at 39).

### D.   Analysis

#### 1.   *Applicable Standard*

ERISA does not contain a standard of review for actions brought under 28 U.S.C. § 1132(a)(1)(B) challenging benefit eligibility determinations. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108-09 (1989) ("Although it is a 'comprehensive and reticulated statute,' ERISA does not set out the appropriate standard of review for actions . . . challenging benefit eligibility determinations."). Moreover, the case law that has developed over time governing such standards has significantly evolved. A history of the evolution of these standards is useful to track

---

[24] Dr. Litow's opinion was also based on evidence concerning the plaintiff's respiratory issues which is not relevant here.

its development and shed light on the current framework.

In *Firestone*, the Supreme Court initially established three distinct standards for courts to employ when reviewing an ERISA plan administrator's benefits decision: "(1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where the plan grants the administrator discretion and the administrator has a conflict of interest." *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010) (citing *Buckley v. Metro. Life*, 115 F.3d 936, 939 (11th Cir. 1997) (discussing *Firestone*, 489 U.S. at 115)). In *Williams v. Bellsouth Telecomms., Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004), *overruled on other grounds by Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352 (11th Cir. 2008), the Eleventh Circuit fleshed out the *Firestone* test into a six-step framework designed to guide courts in evaluating a plan administrator's benefits decision in ERISA actions. When the Eleventh Circuit created the *Williams* test, the sixth step of the sequential framework required courts reviewing a plan administrator's decision to apply a heightened arbitrary and capricious standard if the plan administrator operated under a conflict of interest. *See id.* The Eleventh Circuit later modified this step in response to the Supreme Court's ruling in *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 115-17 (2008), which concluded that a conflict of interest should be weighed

merely as "one factor" in determining whether an administrator abused its discretion. *See Doyle,* 542 F.3d at 1359 ("As we now show, *Glenn* implicitly overrules and conflicts with our precedent requiring courts to review under the heightened standard a conflicted administrator's benefits decision."). The Eleventh Circuit's current iteration of the *Firestone* standard-of-review framework is found in *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350 (11th Cir. 2011), *cert. denied*, 132 S. Ct. 849:

> (1)    Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2)    If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3)    If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

> (4)    If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

> (5)    If there is no conflict, then end the inquiry and affirm the decision.

> (6)    If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355.[25] All steps of the analysis are "potentially at issue" where a plan vests discretion to the plan administrator to make benefits determinations. *See id.* at 1356 n.7. Conversely, then, where a plan does *not* confer discretion, the court simply applies the *de novo* review standard established by the Supreme Court in *Firestone*. *See* 489 U.S. at 115 ("[W]e hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.").

This court has previously held that the "[t]he more deferential arbitrary and capricious standard will be applied to the decision to deny benefits," and that "[t]here is no conflict here." (Doc. 46 at 33, 41). Accordingly, even if the decision to deny benefits was wrong, it will be upheld if "reasonable" grounds supported it.[26]

Under the above cited framework, Fife bears the burden of proving that she is disabled and that the benefit decision is wrong. *Herring v. Aetna Life Ins. Co.*, 517 F. App'x 897, 899 (11th Cir. 2013) (*citing Glazer v. Reliance Standard Life Ins. Co.*,

---

[25] "In ERISA cases, the phrases 'arbitrary and capricious' and 'abuse of discretion' are used interchangeably." *Blankenship*, 644 F.3d at 1355 n.5. Part of the plaintiff's argument in her initial brief in support of her motion for summary judgment is directed to this formulation. (Doc. 38 at 38-42). The court will not address that argument except to say that it has set out the appropriate formulation here.

[26] For these reasons the court has not considered the plaintiff's argument that a conflict of interest tainted the decision. (Doc. 38 at 35-38).

524 F.3d 1241, 1247 (11th Cir.2008)). If Fife satisfies this burden, she then must demonstrate that the decision to deny her LTD benefits was arbitrary and capricious; that is, she must show that the defendants had no reasonable grounds to support the decision. *Herring*, 517 F. App'x at 899 (citing *Glazer*, 524 F.3d at 1247)). It is not the defendants' burden to show that the denial was correct or reasonable.

### 2. *The Appeals Committee Decision Was De Novo Correct <u>and</u> Supported by Reasonable Grounds*

#### a. The Plan's Disability Criteria

Under the Plan, a participant must (among other things) be "prevented from performing any or all of the Material and Substantial Duties of [her] Own Occupation due to any accidental bodily injury [or] sickness …." (Doc. 52 at 36, § 2.04). After 24 months, a participant must be "unable to perform any or all of the Material and Substantial Duties of any Gainful Occupation." (*Id.*). "Material and Substantial Duties" are "the essential tasks of an occupation that cannot reasonably be modified or omitted, not including overtime work." (Doc. 52 at 37, § 2.12). The term "Own Occupation" is defined as

> any similar job that involves Material and Substantial duties of the same general nature as the Participant's regular job at the Participating Cooperative when the disability begins. It does not mean the specific job the Participant is performing for a specific Participating Cooperative or at a specific location.

(Doc. 37 at § 2.15). Further, a claimant seeking disability payment is subject to a "Benefit Waiting Period" -- a 13 week period during which she must demonstrate a "continuous Disability" before benefit payments could commence. (Doc. 52 at 35-36, 42, §§ 2.02, 7.07).

### b.    The Basis for Fife's Claim that She Is Disabled

In this case, the basis for the plaintiff's claim is that she is disabled, as that term is defined under the policy, because of pain.[27] In her memorandum, the plaintiff states that "[t]he record is replete with objective, clinical[] evidence that Fife suffers from <u>severe pain</u> due to cervical degenerative disc disease, lumbar pain, arthritis, and fibromyalgia." (Doc. 38 at 26) (emphasis added); (see also doc. 38 at 31 (mentioning "objective clinical evidence that [p]laintiff suffers from <u>severe pain</u>") (emphasis added). Elsewhere, she argues that she is disabled because she has "an established diagnosis of fibromyalgia and cervical osteoarthritis with bone spurs and disc bulge <u>that causes radicular pain</u>." (Doc. 38 at 32) (see also doc. 38 at 32 (mentioning "diagnosis and treatment of fibromyalgia and pain")) (emphasis added). The plaintiff also argues that "the 'big picture' combination of effects from her primary and

---

[27] The plaintiff has abandoned any claim that she had a respiratory disability. (Doc. 57 at 12) ("Fife objects to these facts because she is not claiming disability on pulmonary/respiratory problems"); doc. 38 at 33 (citing "normal" pulmonary tests and noting that "Fife is not claiming disability on pulmonary disease")). Further, she has abandoned any claim that she was disabled based on a mental condition. (Doc. 57 at 37).

secondary health issues and medications" entitle her to benefits. (Doc. at 33).

### c.   The Medical Evidence Supports the Decision of the Appeals Committee

The court exhaustively set out the evidence above and will not do so again here. However, the court will note that the <u>plaintiff</u> has the burden to show that the decision is *de novo* wrong <u>and</u>, even if it was incorrect, that no reasonable grounds support it. She has made <u>no</u> attempt to do so.

Instead, the plaintiff merely writes that "[c]ounsel has summarized the evidence of disability on pages 4-7 of this brief," and then refers the court to several pages of her brief which the court has already stated it will strike for failure to comply with its scheduling order.  (Doc. 38 at 34) (referring the court to doc. 38 at 6-8). However, even if the pages were not stricken, they do not help the plaintiff. The plaintiff writes:

> 4. Fife submitted substantial and convincing evidence of disability including:
>
> Ex. 1: Favorable Social Security Decision 7/2/12 with disability onset of 6/8/10 (NRECA 131-140) and eight medical records on which the SSA Award was based (NRECA 24-130).
>
> Ex. 11: Dr. Rainer's, Plaintiff's treating physician, confirmation of disability on 12/3/10 (Ex. 11, NRECA 720-721)
>
> Ex. 12: Medical records of Dr. Rainer, which supported his opinions (Ex. 12, NRECA 851-853), 11/30/09, 2/8/10, 5/19/10, 5/25/10, 6/7/10, 6/16/10, 6/21/10, 7/6/10, 7/27/10, 8/4/10, 8/18/10, 9/20/10 (NRECA 229-264).

Ex. 15: Dr. Chindalore's records for fibromyalgia, osteoarthritis, neck pain 7/21/09, 12/4/09, 3/22/10, and 6/30/10. (Ex. 15, NRECA 265-296)

Ex. 16: Dr. Bowen's records of Birmingham Neurosurgery and Spine Group 4/27/10-5/6/10 showing stenosis C6-7 bilaterally and some stenosis at C5-6. (Ex. 16, NRECA 731-742)

Ex. 17: Report of Medical Record Reviewer by Dr. Mary Beth Scholand (Pulmonologist) of Medical Review Institute of America - 12/15/10 who supported disability on the basis of pain. (Ex. 17, NRECA 713-718)

Ex. 20: Fife appeal to CBA 3/1/11 (NRECA 636-638) with submissions of new evidence from Dr. Alexander 12/3/09 (NRECA 647-653) and updated records from Dr. Conner3 11/24/10, 12/21/10, 1/20/11, 1/25/11, 2/10/11, 2/16/11 (NRECA 282-296) (NRECA 667-676) and MRI results and an explanation that fibromyalgia and osteoarthritis were not included because CBA told her to list only the reason she was out of work that week. Fife explained that her disability was not just the pulmonary issues.

Ex. 29: Fife's second appeal notice 8/24/11 (NRECA 474-482) with a chronological history of relevant medical records including a fall in 11/09, history of back pain, confirmation of fibromyalgia with trigger points on 3/22/10, active right C7 radiculopathy and C6 disk pathology on 5/18/10, and diagnosis of disabling pain of 6/19/11 by Dr. Conner. (Ex. 29)

Ex. 31: Vocational report by Dr. Crunk confirming total disability. (Ex. 31)

Ex. 34: Cherokee Health Clinic Records Dr. Ranier 11/30/09, 2/8/10, 5/19/10, 5/25/10, 6/7/10, 6/16/10, 6/21/10, 7/6/10, 7/27/10, 8/4/10, 8/18/10, 9/20/10: (NRECA 229-264)

Ex. 36: Dr. Henry Ruiz, neurosurgeon 5/18/10 (NRECA 765-768): "Impression: Active right C7 radiculopathy secondary to c6 disk

pathology, both degenerative and due to calcification in nature."

> Ex. 37: Evaluation by Dr. Henry Born, examining physician for the SSA, confirming of disability. (Ex. 7, NRECA 693-697; Ex. 37, NRECA 693-697)

> Ex. 38: Dr. Connor's records at Pain & Wound Care Center for fibromyalgia, neck and hip pain with herniated disc in neck 8/8/10-4/17/12: (Ex. 38, NRECA 302-307, 310-315, 318-348, 356-358, 364, 370-371, 374-375, 380-381, 385-387, 389-398)

> Ex. 40: MRI's of 4/27/10, Cherokee Health Clinic. (NRECA 163-174)

(Doc. 38 at 6-8).[28] Conclusorily citing to a mass of records, with very little, if any, discussion, does not satisfy the plaintiff's burden to show <u>both</u> functional limitations <u>and</u> how those limitations "prevent[] [her] from performing any or all of the Material and Substantial Duties of [her] Own Occupation." (Doc. 52 at 36, § 2.04). The plaintiff makes no attempt to argue how any specific finding or record satisfies this burden. For this reason alone, the defendants are entitled to summary judgment.

Further, without going into extensive detail again, the court notes by way of summary that the medical evidence supports the Appeals Committee's opinion that she is not disabled. Certainly there is evidence that Fife complained to some of her regular physicians about pain. However, none of the records of these of physicians

---

[28] The court notes that this language <u>does not</u> come from pages 4-7 of the plaintiff's brief. However, the court assumes that the plaintiff <u>meant</u> to refer to the section the court quotes as it specifically refers to "substantial and convincing evidence of disability," and no other section within the pages the plaintiff cites has such a designation.

reflect that plaintiff was "disabled" as defined by the Plan.

There is no evidence that primary treating physicians thought she was disabled. Dr. Connor's records consistently noted only a moderate decrease in cervical range of motion while measuring strength in all extremities at a 4/5 level. In May of 2011, Dr. Rainer, one of the physicians to whom she complained of pain, opined that the plaintiff "likely could do a sedentary . . . job." (Doc. 65-11 at 21). Finally, Dr. Chindalore frequently noted that Fife had good range of motion, that her low back appears benign, that her lumbosacral "spine flexion" was consistently "within normal limits, she had normal gait, no myopathy or radiculopathy, no vasculitic lesions, her neck was supple with good C-spine range of motion. Only on December 21, 2009, did Dr. Chindalore indicate that all of the fibromyalgia "trigger points" were positive. (Doc. 65-1 at 34). Other times, Dr. Chindalore noted that only "some" or "a few" of the trigger points were positive. (Doc. 65-1 at 27 (January 23, 2009), 32 (March 16, 2009); 32-33 (April 24, 2009); 33 (July 21, 2009); and 37 (June 30, 2010)). The plaintiff offers no analysis or explanation as to how these findings do not at least reasonably support the decision of the Appeals Committee.

Further, the results from two cervical spine MRIs on the plaintiff's back conducted in April 27, 2010, and February 10, 2011, described only "[e]arly spondylotic and degenerative changes," "mild broad-based bulging of the C6

intervertebral disc," and a "[v]ery small broad-based subligamentous bulge at C6-7," which was causing a "mild impression upon on the ventral thecal sac but no significant spinal canal stenosis." (Doc. 65-7 at 35; doc. 65-14 at 80). The plaintiff cites no opinion of any expert, and does not otherwise explain how these test results <u>do not</u> reasonably support the decision of the Appeals Committee.[29] A February 2011 lumbar MRI found <u>no evidence of disc bulge, spinal canal stenosis or foraminal narrowing</u> but noted a right-sided pseudomeningocele at L4 and L5 with questionable right S1 pseudomeningocele. Again, the plaintiff cites no expert who opines that the results of this test show that she was disabled in any way.

Dr. Born documented normal upper and lower extremity strength (with no atrophy in extremity muscles), normal sensory exam, normal reflexes, and normal gait. (Doc. 65-13 at 23-24). Dr. Lafavore wrote: "There [is] insufficient medical evidence to support functional impairment as related to cervical spinal stenosis and/or fibromyalgia." (Doc. 65-13 at 39). Dr. Scholand could only opine that the plaintiff's radicular pain "<u>might</u> be exacerbated by the specific duties of her job." (Doc. 65-14 at 3) (emphasis added). Dr. Scholand <u>did not</u> opine that the plaintiff was "disabled" or unable to perform any of the duties of her job. The plaintiff has not addressed the

---

[29] Notably, Dr. Litow wrote that the April MRI findings were only "consistent with mild degenerative disc disease of the cervical spine." (Doc. 65 at 38).

opinions of these physicians, nor explained why these opinions do not provide reasonable support for the decision of the Appeals Committee.

Finally, reviews by Drs. Litow and Kaplan found that the plaintiff was not functionally limited. Dr. Litow noted that Fife had a variety of complaints but found her "conditions were noted to be chronic and stable." (Doc. 65 at 35). He also found "no physical conditions supported by the clinical evidence that are functionally impairing." (Doc. 65 at 37). He supported this conclusion with:

– contemporaneous records of a May 6, 2010, physical examination by Dr. Bowen which confirmed that Fife had significant functional capacity. (Doc. 65 at 36, 38-39).

– the April 27, 2010 MRI findings that Litow noted were "consistent with mild degenerative disc disease of the cervical spine." (Doc. 65 at 38).

– medical records from Dr. Connor of the Pain and Wound Care Center, noting that those records, ranging in dates from August 18, 2010 through April 17, 2012, consistently noted only a moderate decrease in cervical range of motion while measuring strength in all extremities at a 4/5 level. (Doc. 65 at 37).

– the physical examination documented by Dr. Born on February 23, 2011, which, while documenting decreased range of motion in Fife's cervical and lumbar spine, he also documented normal upper and lower extremity strength

(with no atrophy in extremity muscles), normal sensory exam, normal reflexes, and normal gait. (Doc. 65 at 38).

While Dr. Kaplan acknowledged that Fife had certain orthopedic issues, he found the medical evidence demonstrated that she could work noting:

– "multiple physical examinations and radiographic findings demonstrate excellent retained physical ability." (Doc. 65-10 at 56).

– "[Dr. Rainer] feels that due to the claimant's overall joint pain, fatigue, and dyspnea, she would not be able to work at any job other than a solely sedentary job. Dr. Rainer feels that she likely could do a sedentary sitting job but the claimant perceives she is not able to do that…." (Doc. 65-11 at 21).

– Dr. Chindalore's December 2009 records noted "positive fibromyalgia trigger points [and] painful range of motion" but also noted "normal gait and no myelopathy or radiculopathy." (Doc. 65-10 at 51). Dr. Kaplan also noted how Dr. Chindalore's March 22, 2010, records confirmed that Fife's "hands, wrists, shoulders, elbows, ankles, knees, and hips had good range of motion without any effusion," that her "low back appeared benign," her spine "demonstrated flexion within normal limits," and that her "gait was normal." (Doc. 65-10 at 51-52).

– the May 6, 2010, office notes from her evaluation by Dr. Browne noted

"normal range of motion of all joints and with no deformity," a "normal cognitive examination," a "detailed motor neurological examination" that was "within normal limits," normal gait and an absence of paraspinal muscle spasm. (Doc. 65-10 at 52).

Dr. Kaplan noted that the plaintiff has been diagnosed with firbomyalgia "with very limited objective impairing factors." (Doc. 65-10 at 56). He concluded that:

> From a physical medicine and rehabilitation perspective, the medical evidence does not support a musculoskeletal condition or conditions that would support impairment for a sedentary occupation. Rather, the records outline proposed diagnoses and retained physical abilities such that continuation of a sedentary occupation would not only be possible but likely therapeutic for this claimant.

(Doc. 65-10 at 57).

Based on the evidence in the record, the court determines that the decision of the Appeals Committee was both *de novo* correct <u>and</u>, even if it was not *de novo* correct, that it was supported by reasonable grounds.

### 3.   *None of the Plaintiff's Other Grounds for Reversal Have Merit*

#### a.   **There Is No "Burden of Explanation" Regarding a Favorable SSA Decision**

The plaintiff claims that the decision of the Appeals Committee should be reversed because it failed to explain why it reached a decision that the plaintiff was not disabled when the Social Security Administration reached the opposite

conclusion. She states that the committee "failed to explain the discrepancy between a favorable SSA Award and a denial of LTD benefits for 'own' occupation." (Doc. 38 at 31; doc. 53 at 5-6; doc. 57 at 30-32).[30] She refers to this as the committee's "burden of explanation."

### (1)   Under These Circumstances, the SSA Decision Is Not Relevant

In support of her argument, she cites to the following language in *Metro. Life Ins. Co. v. Glenn (Glenn)*, 554 U.S. 105, 118, 128 S. Ct. 2343, 2352, 171 L. Ed. 2d 299 (2008):

> [T]he court found questionable the fact that MetLife had encouraged Glenn to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so (the remainder going to the lawyers it recommended), and then ignored the agency's finding in concluding that Glenn could in fact do sedentary work. See id., at 666–669. This course of events was not only an important factor in its own right (because it suggested procedural unreasonableness), but also would have justified the court in giving more weight to the conflict (because MetLife's seemingly inconsistent positions were both financially advantageous).

*Glenn*, 554 U.S. at 118. She then states that "[c]ircuit courts across the nation have confirmed that . . . *Glenn* held that insurers have a 'burden of explanation' to address the contrary conclusion reached by the Social Security Administration (SSA)." (Doc. 53 at 4 (citing *Schexnayder v. Hartford Life and Accident Insurance Company*, 600

---

[30] She makes a similar argument at doc. 57 at 40.

F.3d 465, 470-471 (5th Cir. 2010); *Montour v. Hartford Life & Acc. Ins. Co.*, 588

F.3d 623 (9th Cir. 2009); *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d

666, 679 (9th Cir. 2011); *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440

(6th Cir. 2008)).

First, the phrase "burden of explanation," in the context of divergent decisions

on benefits, appears nowhere in *Glenn* or the other cases cited by the plaintiff.[31]

Second, *Glenn* does not stand for the proposition that a contrary decision by the social

security administration must always be considered at every stage of the ERISA

review process.

There are many reasons not to consider a disability decision by the social

security administration. As was recently noted by Magistrate Judge Ott in this district:

> First, the standards and procedures that the SSA employs in determining
> eligibility for disability benefits under the Social Security Act are
> distinct and may differ considerably from those used to determine
> whether a claimant is entitled to disability benefits under the terms of an
> ERISA plan. *See Nord,* 538 U.S. at 832–33, 123 S.Ct. 1965; *Krolnik v.
> Prudential Ins. Co. of Amer.,* 570 F.3d 841, 844 (7th Cir.2009); *Paese
> v. Hartford Life & Acc. Ins. Co.,* 449 F.3d 435, 442–43 (2d Cir.2006);
> *Smith v. Continental Cas. Co.,* 369 F.3d 412, 419–20 (4th Cir.2004).
> Likewise, the ERISA plan administrator may have considered more
> recent or different information or weighed evidence differently. *See Ray,*

---

[31] It does appear in *Salomaa* in a different context. *See, Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 681 (9th Cir. 2011) ("Nothing in [ERISA] suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does [ERISA] impose a heightened burden of explanation on administrators when they reject a treating physician's opinion.") (emphasis added).

> 443 Fed.Appx. at 533; *Schexnayder,* 600 F.3d at 471; *Wade v. Aetna Life Ins. Co.,* 684 F.3d 1360, 1362–63 (8th Cir.2012). It is also possible, of course, that the SSA's decision may have itself simply been wrong. *See Glenn,* 554 U.S. at 134, 128 S.Ct. 2343 (Scalia, J., dissenting).

*Blair v. Metro. Life Ins. Co.*, 955 F. Supp. 2d 1229, 1247 (N.D. Ala. 2013) *aff'd*, 13-13463, 2014 WL 2809138 (11th Cir. June 23, 2014). That is not to say, of course, that a decision by the SSA is never relevant. But it is important to note <u>when</u> it is relevant, and for <u>what purpose</u>.[32] To make this determination, a closer examination of the procedural history and holding of *Glenn* is appropriate.

*Glenn* was an appeal from a Sixth Circuit decision. The Sixth Circuit had noted in its opinion that it was "entitled to take into account the existence of a conflict of interest that results when, as in this case, the plan administrator who decides whether an employee is eligible for benefits is also obligated to pay those benefits." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006) *aff'd sub nom. Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008). The Sixth Circuit held:

> In discussing the applicable standard of review, the district court identified this conflict of interest as a relevant factor in determining whether an abuse of discretion had taken place. *See Glenn v. Metropolitan Life Ins. Co.,* 2005 WL 1364625 at *4 (S.D.Ohio, June 8, 2005) (citing *Firestone Tire & Rubber,* 489 U.S. at 115, 109 S.Ct. 948

---

[32] Other than to state that the decision <u>must</u> be considered, the plaintiff makes no attempt to explain its relevance.

("[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' ") (internal citation omitted)). However, the court's analysis of the plan administrator's basis for terminating benefits does not include any discussion of the role that MetLife's conflict of interest may have played in its decision nor appear to give that conflict any weight. It appears to us, as a result, that this factor did not receive appropriate consideration by the district court.

*Glenn*, 461 F.3d at 666 (internal citations omitted). Then the Sixth Circuit wrote:

There is yet another factor that the district court appears to have given inadequate consideration. The plaintiff contends that the plan administrator was arbitrary in failing to consider the award of disability benefits that she secured from the Social Security Administration. The record reflects that Metlife notified her that payments for long-term disability were subject to a discount for amounts received from other sources and steered her to a law firm specializing in securing disability benefits from the Social Security Administration. After the firm secured an award of benefits for her based on a claim of total disability, MetLife deducted the amount of those government benefits from the disability payments that it was obliged to pay and demanded a refund from Glenn in the amount of $13,500. And, yet, in making the decision to terminate payments under the MetLife policy, the plan administrator gave no weight whatever to the Social Security Administration's determination of total disability. Hence, Glenn posits that MetLife took blatantly inconsistent positions-relying on the finding by the Social Security administrative law judge that she was totally disabled but contending that she was capable of performing sedentary work in denying her ERISA benefits.

The district court recognized this inconsistency but declined to invoke the doctrine of estoppel. Although we conclude that this ruling was technically correct, the fact that MetLife and the Social Security Administration reached contrary conclusions regarding Glenn's disability status has two ramifications for this appeal. The first stems from the fact that MetLife assisted Glenn in obtaining Social Security

benefits and reaped a financial benefit of its own when that assistance was successful. The second issue relates to the fact that, in denying Glenn continuation of her long-term benefits, MetLife failed to address Social Security's contrary determination of Glenn's status. It is obvious that <u>both</u> factors are relevant in determining whether MetLife's decision was arbitrary and capricious.

*Id.* at 666-67 (emphasis added). The Sixth Circuit's opinion stands for the proposition that a contrary disability determination by the Social Security Administration is relevant, <u>when there is a conflict of interest</u>, for the purpose of determining whether the decision was arbitrary and capricious.

The Supreme Court's decision on appeal did not broaden the scope of the relevance of an SSA decision. Indeed, that specific issue was not before the court. The issues before the Court were only: 1) "whether a plan administrator that both evaluates and pays claims operates under a conflict of interest in making discretionary benefit determinations," and 2) "'how' any such conflict should 'be taken into account on judicial review of a discretionary benefit determination.'" *Glenn*, 554 U.S. at 110. After determining that there was a conflict of interest in the circumstances before it, the Supreme Court held that "when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one." *Id.* at 117. The Court then noted that "[t]he Court of Appeals' opinion in the present case illustrates the combination-of-factors method of review." *Id.* at 118. It then included the passage cited by the plaintiff which, again,

reads:

> [T]he court found questionable the fact that MetLife had encouraged
> Glenn to argue to the Social Security Administration that she could do
> no work, received the bulk of the benefits of her success in doing so (the
> remainder going to the lawyers it recommended), and then ignored the
> agency's finding in concluding that Glenn could in fact do sedentary
> work. See id., at 666–669. <u>This course of events was not only an
> important factor in its own right (because it suggested procedural
> unreasonableness), but also would have justified the court in giving
> more weight to the conflict (because MetLife's seemingly inconsistent
> positions were both financially advantageous)</u>.

*Glenn*, 554 U.S. at 118 (emphasis added).

Placed in context, it is clear that the Supreme Court's decision only notes the

relevance of an SSA decision <u>when there is a conflict of interest</u>. Indeed, all of the

circuit court cases cited by the plaintiff are conflict cases. *See, Schexnayder*, 600 F.3d

at 471 ("Failure to address a contrary SSA award can suggest "procedural

unreasonableness" in a plan administrator's decision. . . . This procedural

unreasonableness is important in its own right and also "justifie[s] the court in giving

more weight to the conflict.") (citing *Glenn*, 128 S.Ct. at 2352); *Montour*, 588 F.3d

at 630 (discussing the weight to be given to several "conflict factors," including "a

contrary SSA disability determination"); *Salomaa*, 642 F.3d at 679 (noting that where

there is a conflict of interest, "[e]vidence of a Social Security award of disability

benefits is of sufficient significance that failure to address it offers support that the

plan administrator's denial was arbitrary, an abuse of discretion"); *DeLisle*, 558 F.3d

61

at 446 ("Although there is no technical requirement to explicitly distinguish a favorable Social Security determination in every case, '[i]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary and capricious.'" ) (quoting *Bennett v. Kemper Nat'l Servs.,* 514 F.3d 547, 554 (6th Cir.2008)).[33] In this case, the court has already determined that "[t]here is no conflict here." (Doc. 46 at 41). Accordingly, the SSA decision is not relevant.[34]

---

[33] The plaintiff cited as "supplemental authority" the Eleventh Circuit's recent decision in *Melech v. Life Ins. Co. of N. Am.*, 739 F.3d 663 (11th Cir. 2014). In that decision the Eleventh Circuit panel remanded on the basis that the decisionmaker "had an obligation to consider evidence presented to the SSA," prior to deciding whether the plaintiff was entitled to benefits. *Melech*, 739 F.3d at 666. That issue is not before this court. Further, *Melech* also involved a conflict of interest and the court's decision was based in no small part on "the Policy terms that required [the plaintiff] to apply for SSDI and LINA's seemingly selfinterested disregard for her SSDI application," which the court said "give us pause." *Id.* at 674; *see also, id.* at 675-676 (discussing "the specter of procedural unreasonableness" and noting "the inconsistency between an administrator's policies encouraging its claimants to apply for SSDI (for the administrator's financial benefit), and the administrator's subsequent denial of benefits under the ERISA plan, to support the court's decision to reverse the administrator's denial of benefits.") (*citing Glenn*, 461 F.3d at 666–669; *Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir.1998) (Posner, J.); *Montour*, 588 F.3d at 635–37). Again, in this case there is no conflict.

[34] This same argument was recently before Magistrate Judge John Ott in *Blair v. Metro. Life Ins. Co.*, 955 F. Supp. 2d 1229, 1246-47 (N.D. Ala. 2013) *aff'd*, 13-13463, 2014 WL 2809138 (11th Cir. June 23, 2014). The court has reviewed and takes judicial notice of the pleadings in *Blair*. The plaintiff's argument in the instant case closely resembles that in *Blair*. (See, doc. 19 at 10-12 in *Blair v. Metro. Life Ins. Co.*, 4:12-cv-01776-JEO (N.D. Ala.). Not coincidentally, she was represented by the same attorney as the instant plaintiff. However, in *Blair,* plaintiff's counsel recognized that an "indication that conflict of interest tainted the

### (2)    Even If the SSA Decision Is Relevant, It Was Considered by the Appeals Committee

Importantly, this case was <u>remanded</u> to the Appeals Committee for the express purpose of reviewing the favorable SSA decision. The Appeals Committee did so. In its decision, the Appeals Committee made note of the favorable SSDI award and wrote that

> that award is not binding on the NRECA Long Term Disability Plan which is governed by the Employee Retirement Income Security Act of 1974 (ERISA). SSDI decisions are determined according to a series of procedural and regulatory rules that apply to SSDI benefits but not to ERISA plans. Further, the definition of disability applicable to SSDI benefits is not the same as the definition in the NRECA Long Term disability Plan. Our decision is also based on the factual information contained in the administrative record for Ms. Fife's claim. That record contains information that we understand was not provided to the Social Security Administration when it decided your client's claim for SSDI benefits . . . As a result, the SSDI decision is not binding on the NRECA Long Term Disability Plan because it was a different decision, made under different procedural standards by a different decisionmaker, and was based on different evidence.

(Doc. 36-6 at 13). The Eleventh Circuit has found that this type of "explanation" is enough. *See, Blair v. Metro. Life Ins. Co.*, 13-13463, 2014 WL 2809138 at *4 (11th Cir. June 23, 2014) ("[C]ontrary to Blair's assertions, MetLife did consider her favorable SSA award. MetLife's January 30, 2009 determination makes note of the

---

decision to terminate benefits is the disregard for the SSA favorable decision." (*Id.* at 10) (emphasis added).

award and explains that the awarding of SSA benefits does not guarantee the approval or continuation of LTD benefits because the SSA benefits decision is separate from and governed by different standards than MetLife's review and determination under the Plan. Accordingly, this argument fails.").[35, 36]

---

[35] In *Blair* the Eleventh Circuit also affirmed Magistrate Judge Ott after noting that he "did consider Blair's favorable award of SSA benefits but found that the only information in the record relating to Blair's SSA award was the fact that she was awarded SSA benefits in March 2008. That is all. Accordingly, [the court] could not address the claim in more detail. Blair did not produce any other information, like, for example, an opinion from an administrative law judge awarding benefits. The district court did not even know what materials the SSA considered in making its favorable decision because Blair did not provide it with that information." *Blair v. Metro. Life Ins. Co.*, 13-13463, 2014 WL 2809138 at *4 (11th Cir. June 23, 2014). In this case, while the opinion of the ALJ does appear in the record (doc. 36-1 at 114) plaintiff has made no attempt to discuss or explain why that decision demonstrates why the decision of the Appeals Committee was wrong. Notably, the parties agree that Fife was awarded SSDI benefits based on the ALJ's conclusion that she was disabled by orthopedic issues, arthritis, fibromyalgia, asthma, and depression. (Doc. 65-2 at 52-60). Yet the ALJ also found that Fife "has the residual functional capacity to perform a significant range of light work as defined in 20 C.F.R. § 404.14567(b) except the claimant has distracting pain that is increased with physical activity to the abandonment of tasks, and medication side effects that limit effectiveness due to distraction, inattention, drowsiness, etc." (Doc. 65-2 at 58). In the decision, the ALJ noted that "[g]reater weight is given to the treating source records than the reports of the non-examining, reviewing sources at the State agency …." (Doc. 65-2 at 59). 71. The ALJ noted that "[m]edical improvement is expected, with appropriate treatment," and noted the need for another review in 18 months. (Doc. 65-2 at 60). It is undisputed that the ALJ did not have, and therefore could not consider, certain evidence found in the administrative record here, including the opinions of Drs. Scholand, Lafavore, Cosmo, Kaplan, Litow and Goldman, and the statements by two of Fife's treating physicians, Drs. Grubbe and Rainer. The court finds that even if this award was relevant under these circumstances, at the very least it provides a support for the proposition that the decision was reasonably based.

[36] The plaintiff also argues that the Appeals Committee relied in error on the presumption that the definition of disability under the Plan was more strict than Social Security's definition. (Doc. 57 at 32-33). The court rejects this argument as the language quoted above shows that the Committee stated only that "the definition of disability applicable to SSDI benefits is not the same as the definition in the NRECA Long Term disability Plan." (Doc. 36-6 at 13) (emphasis added). Further, the Committee stated that its decision was "based on the factual information contained in the administrative record for Ms. Fife's claim." (Doc. 36-6 at 13).

**b.    The Appeals Committee Did Not Use the Incorrect Definition of Disability in the Plan**

The plaintiff picks out, and finds fault with, the following phrase form the Appeals Committee's decision: "The Committee notes that the information available is insufficient to support Ms. Fife's inability to perform the functions of her sedentary occupation beyond October 22, 2010." (Doc. 36-6 at 14). Under the Plan, a participant must (among other things) be "prevented from performing <u>any or all</u> of the Material and Substantial Duties of [her] Own Occupation due to any accidental bodily injury [or] sickness …." (Doc. 52 at 36, § 2.04). In a wholly cursory and underdeveloped argument, the plaintiff contends that the language she cites reveals that Appeals Committee used an incorrect standard which required that, in order to be considered "disabled," the plaintiff be unable to perform <u>all</u> of the functions of her previous job, as opposed to just one. (Doc. 38 at 32; doc. 57 at 34, 36-37; doc. 53 at 6).

The Appeals Committee's <u>noting</u> that the evidence was insufficient to support her inability to perform the function<u>s</u> (plural) of her sedentary occupation, is not the same as it <u>finding</u> that she is not disabled for that reason alone. The actual basis and criteria for its decision can be found <u>one sentence after the sentence which troubles the plaintiff</u>, where the Appeals Committee clearly stated:

[I]t was the decision of the Committee that, based on their review of the

entire file, the medical documentation does not support that Ms. Fife had any condition that rose to a level of impairment sufficient to cause her to be unable to engage in <u>any and all</u> of the Material and Substantial Duties of her Own Occupation as a Payroll Clerk[.]

(Doc. 36-6 at 14) (emphasis added). This language exactly tracks the Plan language.

The Appeals Committee did not use the wrong definition of disability.

### c.    The Vocational Evaluation of William A. Crunk, PhD, CRC

Crunk evaluated Fife on October 24, 2011. (Doc. 65-9 at 29). He opined that "[s]he would be considered totally disabled as it related to work." (Doc. 65-9 at 30). This opinion was not discussed in the Appeals Committee's decision of March 20, 2013. In its decision of December 30, 2011, the Appeals Committee did consider the decision and appeared to give it no weight noting "there is no objective information regarding her functional limitations or restrictions." (Doc. 65-9 at 27). The plaintiff writes that

the Appeals Committee abused whatever discretion it had by wrongly and unreasonably refusing to reinstate benefits . . . because it:

. . .

**failed to consider** the vocational evaluation of Dr. Crunk on the second appeal because "**there is no objective information regarding her functional limitations or restrictions** and failed[] to mention the evaluation in the denial after court remand.

(Doc. 38 at 31, 32; doc. 53 at 6; doc. 57 at 37) (citations omitted) (emphasis in

original). The plaintiff provides no other discussion or analysis. The plaintiff has not explained why failing to consider Crunk's opinion under these circumstances was first incorrect, and, even if it was incorrect, how that would make the Committee's decision both *de novo* wrong <u>and</u> not at least supported by a reasonable basis.

Further, while the Appeals Committee did not mention Crunk's letter in its final decision, it is clear (and the plaintiff agrees) that it <u>was</u> considered by the committee in the Second Appeal. (Doc. 65-9 at 27). In that appeal the committee discounted Crunk's conclusions because "there is no objective information regarding her functional limitations or restrictions." (Doc. 65-9 at 27). As was noted in *Howard v. Hartford Life & Acc. Ins. Co.*, 929 F. Supp. 2d 1264, 1294 (M.D. Fla. 2013) *aff'd*, 563 F. App'x 658 (11th Cir. 2014),

> " 'Even for subjective conditions like fibromyalgia, it is reasonable to expect medical evidence of an inability to work.' " *Pinto v. Aetna Life Ins. Co.,* No. 6:09–cv–01893–Orl–22GJK, 2011 WL 536443, at *10 (M.D.Fla. Feb. 15, 2011) (quoting *Creel v. Wachovia Corp.,* No. 08–10961, 2009 WL 179584, at *9 (11th Cir. Jan. 27, 2009)).

*Howard,* 929 F. Supp. 2d at 1295. The plaintiff has not explained why the Appeals Committee's conclusion in this regard was incorrect. Further, she has not shown why, once the committee disregarded this opinion in the Second Appeal, it was error to fail to mention it in the Third Appeal.  Finally, the plaintiff has not shown why, even if Crunk's opinion <u>was</u> considered, the decision would not still have a reasonable basis

in light of the numerous opinions from medical doctors which support the decision.

### d.   A Diagnosis of Certain Conditions Which Cause Pain Does Not Establish Disability

The plaintiff states that

[T]he Appeals Committee abused whatever discretion it had by wrongly and unreasonably refusing to reinstate benefits . . . because it:

. . .

**admitted the severity** of Fife's condition and the existence of objective clinical evidence that Plaintiff suffers from severe pain:

"[Your client had] an established diagnosis of fibromyalgia and **cervical osteoarthritis** with **bone spurs** and **disc bulge** that causes radicular pain that might be exacerbated by the specific duties of your job."

(Doc. 38 at 31-32; doc. 53 at 6)(quoting doc. 36-6 at 4) (emphasis in original). The plaintiff makes substantially the same argument in document 57 at page 36, but also adds the following paragraph from the Appeals Committee's March 20, 2013, opinion:

Office notes signed by Dr. Chindalore dated April 16, 2004, through December 21, 2009, document the claimant's evaluation and treatment for myalgias and arthralgias. Dr. Litow noted the physical exam dated December 21, 2009, indicates "all fibromyalgia trigger points are positive," painful range of motion of multiple joints, normal flexion of the lumbar spine, and normal gait.

(Doc. 57 at 36) (quoting doc. 36-6 at 8). The plaintiff provides no further explanation as to why these facts might be important.

68

The first quote is based upon the same finding by Dr. Scholand that the plaintiff has pain which <u>might</u> be exacerbated by the specific duties of her job. This is speculation. But even if it is not, the statement does conclude that the plaintiff's condition is "severe" at all, and certainly does not conclude that her pain would prevent her from working.

Further, in setting out these quotes, the plaintiff seems to be arguing that the mere <u>diagnosis</u> of fibromyalgia is sufficient for her to be disabled. While it is true that CBA and the independent physicians did generally accept the validity of her diagnoses, a diagnosis alone does not confirm a disability. *Howard v. Hartford Life & Acc. Ins. Co.*, 929 F. Supp. 2d 1264, 1294 (M.D. Fla. 2013) *aff'd*, 563 F. App'x 658 (11th Cir. 2014) ("Indeed, doctors' diagnoses do not in and of themselves, establish a disability and inability to work.").

> Some people may have such a severe case of fibromyalgia as to be totally disabled from working, Michael Doherty & Adrian Jones, "Fibromyalgia Syndrome (ABC of Rheumatology)," 310 *British Med.J.* 386 (1995); *Preston v. Secretary of Health & Human Services,* 854 F.2d 815, 818 (6th Cir.1988) (per curiam), but most do not and the question is whether [the plaintiff] is one of the minority.

*Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). The plaintiff has failed to show how the quoted sections provide medical evidence of an inability to work.

### e. The Defendants Were under No Duty To Have the Plaintiff Evaluated Further

The plaintiff states that

> [T]he Appeals Committee abused whatever discretion it had by wrongly and unreasonably refusing to reinstate benefits . . . because it:
>
> . . .
>
> Failed to hire a rheumatologist to assess [p]laintiff's medical records regarding diagnosis and treatment of fibromyalgia and pain.

(Doc. 38 at 32; doc. 53 at 6; doc. 57 at 37). The plaintiff does not explain, nor provide authority for why, considering all of the opinions already in the record, and the multiple reviews by independent examiners, this additional review was necessary and/or would have made a difference. This underdeveloped argument is without merit.

### f. There Is No Evidence that the Opinions of the Plaintiff's Treating Physicians Were Ignored

The plaintiff states that

> [T]he Appeals Committee abused whatever discretion it had by wrongly and unreasonably refusing to reinstate benefits . . . because it:
>
> . . .
>
> Disregarded [the] opinion of treating physicians contrary to [the] instructions of *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), in which the U.S. Supreme Court held [the at] fiduciary may not arbitrarily refuse to credit the opinion of [a] treating physician.

70

(Doc. 38 at 32; doc. 53 at 7; doc. 57 at 37). This underdeveloped argument does not explain <u>which</u> opinions of <u>what</u> treating physicians were ignored.

Importantly, too, in *Black & Decker*, the Supreme Court also held that

courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Black & Decker*, 538 U.S. at 834. Accordingly, even if the plaintiff has identified certain favorable opinions of her treating physicians, which she has not, they would be entitled to no special weight, and the decision would not be unreasonable simply because of a disagreement between the plaintiff's treating physician and the Plan's record reviewers.[37]

---

[37] The plaintiff argues that

Several circuits have recently held that it was arbitrary and capricious to rely on solely record reviewers instead of treating physicians. *See Helfman v. GE Group Life Assurance Company and Sun Life Assurance Company of Canada*, 573 F.3d 383 (6th Cir. 2009), *Holstrom v. MetLife*, 615 F.3d 758 (7th Cir. 2010) and *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623 (9th Cir. 2009):

"Another factor is Hartford's decision to conduct a 'pure paper' review in this case, that is, to hire doctors to review Montour's files rather than to conduct an in-person medical evaluation of him."

(Doc. 57 at 41). Even if the court were bound to follow these cases, the record clearly shows that the Appeals Committee did not rely "solely" on record reviewers.

> **g.    The Appeals Committee Did Not Err in Requiring Objective Evidence that the Plaintiff's Conditions Were Disabling**

The plaintiff argues that the Eleventh Circuit's opinion in *Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1197 (11th Cir. 2007) "held that it is arbitrary and capricious to require objective evidence and to disregard a treating physician's opinion in favor of a medical reviewer's opinion." (Doc. 57 at 35). She then argues that the Appeals Committee erred when it "[r]equired objective evidence contrary to *Oliver*." Again, this underdeveloped argument does not explain how the Appeals Committee required such objective evidence.

First, as has been noted:

> *Oliver* did not create a broadly applicable rule requiring disability plan administrators to credit, in every case, a claimant's subjective complaints of pain. The *Oliver* Court simply found that in the context of the plaintiff's diagnosis and medical records, and under the terms of the plan at issue in that case, the administrator's decision to deny benefits because of a lack of "objective medical evidence" was arbitrary and capricious.

*Tippitt v. Reliance Standard Life Ins. Co.*, CIV.A.1:02-CV1140JEC, 2007 WL 4054664 (N.D. Ga. Nov. 7, 2007) *aff'd*, 276 F. App'x 912 (11th Cir. 2008). Further, in this case, as opposed to *Oliver*, it is undisputed that the plaintiff has pain <u>from fibromyalgia and other conditions</u>. In *Oliver*, by contrast, "Coca–Cola based its rejection of Oliver's claim on its contention that Oliver failed to provide 'objective

72

evidence' of his disability, stating that the 'true organic etiology' of Oliver's pain had not been determined." *Oliver*, 497 F.3d at 1196. Requiring objective evidence of "the limitations" the plaintiff claims as a result of her diagnosis is acceptable. *Gipson v. Admin. Comm. Of Delta Air Lines, Inc.*, 350 F. App'x 389, 395 (11th Cir. 2009); *Keith v. Prudential Ins. Co. of Am.*, 347 F. App'x 548, 551 (11th Cir. 2009). In *Stiltz v. Metro. Life Ins. Co.*, 244 F. App'x 260, 264-65 (11th Cir. 2007), the Eleventh circuit illustrated the difference, writing:

> [T]he record does not reveal that MetLife denied benefits based on a failure to provide objective evidence of Stiltz's ailments. To borrow the words of our sister circuit, "MetLife's communications with [Stiltz] support its contention that it was requesting only substantiation of the extent of [Stiltz]'s disability and not an impossible level of objective proof that [he] suffered from fibromyalgia." *Pralutsky v. Metro. Life Ins. Co.,* 435 F.3d 833, 839 (8th Cir.2006). MetLife's final decision considered both the subjective and the objective evidence in Stiltz's file, and MetLife found that the objective evidence in the functional capacity evaluation was the more reliable evidence of Stiltz's ability to work.

Similarly in this case, there is no evidence that the defendants required the plaintiff to prove, by objective evidence, that she had any of the ailments of which she complains.[38]

---

[38] Strangely, after arguing that the Appeals Committee improperly required objective evidence, the plaintiff also argues that "[t]he [Appeals Committee] failed to objectively consider Fife's fibromyalgia." (Doc. 57 at 41). The court is unsure of exactly what the plaintiff is arguing here. She includes a lengthy block quotation from Judge Bowdre's opinion in *Williams v. United of Omaha Life Ins. Co.*, CV-11-BE-3948-S, 2013 WL 5519525 (N.D. Ala. Sept. 30, 2013), but omits, without a signal to that effect, multiple paragraphs, and fails to include a pinpoint citation. Even considering what is included in the block quote it is unclear for what purpose this case is

### h.   Dr. Litow's Statement that Fife's Evaluations Have Been Normal

The plaintiff states that

[T]he Appeals Committee abused whatever discretion it had by wrongly and unreasonably refusing to reinstate benefits . . . because it:

. . .

Relied on Dr. Litow's statement that "Fife's evaluations have been normal" when Dr. Litow was only referring to pulmonary tests.

---

cited. At one point Judge Bowdre's opinion notes that it is inappropriate to require objective evidence of fibromyalgia. *Williams*, 2013 WL 5519525 at * 11 ("If the court were to require objective facts such as lab tests or an xray to support a diagnosis, no patient would ever be disabled based on fibromyalgia."). She also wrote that she "finds troubling the contrary position of United of Omaha's in-house doctor, who is not a rheumatologist but who takes the rather extraordinary position that no objective evidence supports any of these conditions." *Id.* However, as stated above, it is acceptable to require objective evidence that a condition is disabling. Judge Bowdre also wrote:

> The records of treating physician Dr. McLain are particularly helpful, as he not only had the opportunity to treat Williams over a period of time and to note the patterns of her diseases, but he also specializes in rheumatology. His medical opinion is that Williams's pain is disabling, that she is not exaggerating her complaints or malingering, that her complaints of regular pain on a level eight out of ten were consistent with her medical conditions, and that her pain could reasonably be expected either to cause serious distraction from job tasks or to cause her to fail to complete job tasks on more than an occasional basis.

*Id.* at 12. The plaintiff says that "[a]n appropriate decision in this case would be to substitute the name of Dr. Chindalore, the treating physician for Dr. McLain." (Doc. 57 at 43). However, she provides no additional information, argument, or citations explaining why that would be the case. The court notes that Dr. Chindalore's records support the conclusion that the plaintiff had no functional impairment. Further, only on December 21, 2009, did Dr. Chindalore indicate that all of the fibromyalgia "trigger points" were positive. (Doc. 65-1 at 34). Unlike Dr. McLain in *Williams*, in the instant case the plaintiff cites no opinion of Dr. Chindalore where her condition is considered "disabling," or any other opinion regarding her level of pain. Again, as with most of the plaintiff's argument, she seems to merely point to the medical records and ask the court to find supportive evidence for her.

(Doc. 57 at 36). First, the plaintiff provides no cite for the court to determine to what tests Dr. Litow was referring. However, the court notes that Litow was asked to review the plaintiff's claims to see if she was disabled for pulmonary reasons as well as for pain.  Accordingly, it was not inappropriate to rely on this opinion that pulmonary tests were normal.

The plaintiff may be arguing that this line of the opinion is misleading in that it implies that <u>all</u> of the plaintiff's tests (including non-pulmonary) were normal. That argument too is without merit as the very next line of the opinion reads that "Dr. Litow <u>also</u> noted that there were <u>no impairing physical conditions supported</u>." (Doc. 36-6 at 12). In light of the fact that Dr. Litow evaluated the plaintiff's capacity to work based on physical pain <u>and</u> pulmonary issues, this second line, by discussing only "physical conditions," clarified that the "normal" tests to which the Committee referred were only the pulmonary tests. " Regardless, the record as a whole was considered by the Committee, and its decision, as a whole, indicates that it considered the full extent of Dr. Litow's opinion, as well as the other record evidence.

### i.    There Is No Reason To Ignore the Opinions of Dr. Litow

In arguing that the opinion of Dr. Litow is "flawed," "biased," and "not based

on substantial evidence,"[39] the plaintiff makes some of the same underdeveloped arguments she made above, including that he:

– "**misrepresented the status of Fife's medical records** stating that pulmonary tests were normal. Fife is not claiming disability on pulmonary disease" (doc. 38 at 33; doc. 53 at 7; 57 at 38) (emphasis in original);

– "**failed to consider** the favorable SSA decision as evidence" (doc. 38 at 33; doc. 53 at 7; doc. 57 at 38) (emphasis in original);

– "**failed to explain** the discrepancy between a favorable SSA Award and a denial of LTD benefits of 'own' occupation" (doc. 38 at 33; doc. 53 at 7; doc. 57 at 38) (emphasis in original); and

– "**failed to acknowledge** the definition of disability which allows disability if claimant is prevented from performing any of the material duties of her occupation." (doc. 38 at 33-34; doc. 53 at 8; doc. 57 at 39) (emphasis in original).

These arguments have already been addressed as to the Committee decision. For

---

[39] As with most of her arguments, the plaintiff restates and incorporates this same argument in multiple submissions. In documents 38 and 53, she states that the opinion of "the <u>two</u> record reviewers" are flawed, biased and not based on substantial evidence. (Doc. 38 at 32; doc. 53 at 7) (emphasis added). Although she does not mention him by name, the second reviewer is Dr. Goldman, a board certified psychiatrist. In Document 57, the plaintiff has narrowed her complaints to just the opinion of Dr. Litow. This is likely because she has abandoned a claim based on any psychological disorder. For that reason, the court will address these complaints only as to the opinion of Dr. Litow.

those same reasons, they fail here as well.

The plaintiff also argues that Dr. Litow "filed to address the opinion of Dr. Rainier and the records and report of Dr. Conner, stating that Dr. Conner's records were illegible." (Doc. 38 at 33; doc. 53 at 7; doc. 57 at 38). On the contrary, the record clearly shows that he found "no physical conditions supported by the clinical evidence that are functionally impairing" (doc. 65 at 37), a conclusion he supported in part by medical records from Dr. Connor, ranging in dates from August 18, 2010 through April 17, 2012, which consistently noted only a moderate decrease in cervical range of motion while measuring strength in all extremities at a 4/5 level. (Doc. 65 at 37).[40] Further, the plaintiff does not explain what "illegible" medical records were not considered, what those records actually showed, and why that would make a difference. Further, Dr. Litow was clear that he considered the records from "Multiple Providers at Cherokee Health Clinic, dated 4/17/09 through 3/3/11." Dr. Rainer was one of those providers. (See doc. 36-12; doc. 57 at 18-19 (citing to documents from Cherokee Health Clinic as "[m]edical records of Dr. Rainer, which supported his opinions")). If there are other such records which the plaintiff feels should have been considered, and were not, <u>it was her burden to establish as much</u>. The vague allusion

---

[40] The actual record itself discusses office visits by "various providers" at the Pain and Wound Care Center. (Doc. 65 at 37). However, the parties have stipulated that these are records from Dr. Connor. (See doc. 51 at 24 (defendants' proffered fact number 81); doc. 57 at 23 (plaintiff's statement that the fact is "admitted, but irrelevant")).

to "medical records which were not considered," does not carry that burden.

The plaintiff claims that Dr. Litow

> **"[c]herry picked" evidence** to substantiate predetermined opinions that
> the medical records did not substantiate Fife's disability while failing to
> explain the SSA favorable opinion. Neither of the record reviewers
> attempted to assess the Plaintiff's ability to work based on the 'big
> picture' combination of effects from the Plaintiff's primary and
> secondary health issues and medications. Instead, the record reviewers'
> opinions that the Plaintiff was able to perform some sedentary work
> were based on what was, at best, an incomplete picture of the Plaintiff's
> overall health situation.

(Doc. 38 at 33; doc. 53 at 7-8; doc. 57 at 38-39) (emphasis in original). Needless to

say, this vague argument, which makes no attempt to explain which portions of what

favorable evidence were omitted by Dr. Litow, fails to satisfy the plaintiff's burden.

Further, the argument that the "big picture" was not considered is undercut by the vast

amount of evidence that Dr. Litow states she reviewed, and the fact that she

considered whether the plaintiff was disabled based on both pulmonary and physical

disabilities and still found her not to be functionally impaired.

The plaintiff claims that Dr. Litow "[f]ailed to mention Fife's pain caused by

fibromyalgia or the effects of pain medications," and quotes the following question

and answer from her report:

> "Are there any physical condition(s) supported by the clinical evidence
> that are functionally impairing? Please explain."
>
> "No, for the timeframe from June 11, 2010 forward, there are no

physical conditions supported by the clinical evidence that are functionally impairing."

(Doc. 38 at 34; doc. 53 at 8; doc. 57 at 39) (quoting doc. 65 at 37). This argument is without merit. Dr. Litow clearly considered voluminous medical records and test results in reaching her opinion that the plaintiff was not functionally impaired. Her report noted that the plaintiff's medical conditions included "neck pain, back pain, [and] fibromyalgia." (Doc. 65 at 36). She also noted and considered the plaintiff's complaints of pain which were documented in the various medical records. (Doc. 65 at 36-37). She also noted that the medical records she reviewed "do not support any evidence of side effects from the claimant's medications." (Doc. 65 at 39). The plaintiff has pointed to no records or alleged side effects from medications which Dr. Litow did not consider.

The plaintiff argues that Dr. Litow "**[f]ailed to dispute** the diagnoses of the [p]laintiff's treating physicians and failed to dispute that the [p]laintiff's underlying conditions can cause the debilitating symptoms she complains of and never examined or spoke to Fife." (Doc. 38 at 34; doc. 53 at 8; doc. 57 at 39) (emphasis in original). As noted above, neither Dr. Litow, nor the defendants, dispute that the plaintiff has the conditions of which she claims. The issue is only whether those conditions are disabling. The plaintiff cites to no opinions of treating physicians which were not considered. Further, there is no requirement that Dr. Litow personally examine or

speak to the plaintiff for her independent evaluation to have merit. The plaintiff does not explain why that was necessary or what difference it would have made.

The plaintiff's motion for summary judgment will be **DENIED**, and the defendants' motion for summary judgment will be **GRANTED**.

## V.    CONCLUSION

For the reasons stated herein the following will be ordered:

1.     The plaintiff's motion for summary judgment (doc. 36) will be **DENIED**;

2.     the defendants' motion for summary judgment (doc. 50) will be **GRANTED**;

3.     the plaintiff's objection to and motion to strike portions of an affidavit offered in support of the defendants' motion for summary judgment (doc. 55) will be treated as a objection and will be **SUSTAINED**;

4.     the plaintiff's objection to and motion to strike certain facts proffered in support of the defendants' motion for summary judgment (doc. 56), will be treated as an objection, and will be **SUSTAINED in part** and **OVERRULED in part** as noted herein;

5.     the plaintiff's motion to allow supplemental authority (doc. 62) will be **GRANTED**; and

80

6.      portions of the materials cited by the parties will be **STRICKEN** as

noted herein. (*See* Section III. B. of this opinion).

A separate order will be entered.

**DONE** and **ORDERED** this 10th day of September, 2014.

**VIRGINIA EMERSON HOPKINS**
United States District Judge